# DOOLEY *v.* UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTH-
ERN DISTRICT OF NEW YORK.

No. 207. Argued January 8, 9, 10, 11, 1901.—Decided December 2, 1901.

The act of Congress taking effect May 1, 1900, and known as the Foraker act, which requires all merchandise going into Porto Rico from the United States to pay a duty of fifteen per cent of the amount of duties paid upon merchandise imported from foreign countries, is constitutional.

The Constitution, in declaring that no tax or duty shall be laid on articles exported from any State, is limited to articles exported to a foreign country, and has no application to Porto Rico, which, in the case of *De Lima*

v. *Bidwell,* 182 U. S. 1, was held not to be a foreign country within the meaning of the general tariff law then in force.

The fact that the duties so collected were not covered into the general fund of the Treasury, but held as a separate fund to be used for the government and benefit of Porto Rico, and were made subject to repeal by the legislative assembly of that island, shows that the tax was not intended as a duty upon exports, and that Congress was undertaking to legislate for the island temporarily, and only until a local government was put in operation.

THIS was an action begun in the Circuit Court as a Court of Claims by the firm of Dooley, Smith & Co., to recover duties exacted of them and paid under protest to the collector of the port of San Juan, Porto Rico, upon merchandise imported into that port from the port of New York after May 1, 1900, and since the Foraker act. This act requires all merchandise "coming into Porto Rico from the United States" to be "entered at the several ports of entry upon payment of fifteen per centum of the duties which are required to be levied, collected and paid upon like articles of merchandise imported from foreign countries."

A demurrer was interposed by the District Attorney upon the ground that the court had no jurisdiction of the subject of the action, and also that the complaint did not state facts sufficient to constitute a cause of action. The demurrer to the complaint for insufficiency was sustained, and the petition dismissed.

The case was argued with *De Lima* v. *Bidwell,* 182 U. S. 1; *Downes* v. *Bidwell,* 182 U. S. 244; *Dooley* v. *United States,* 182 U. S. 222; and *Armstrong* v. *United States,* 182 U. S. 243.

*Mr. Henry M. Ward* and *Mr. John G. Carlisle* for plaintiff in error. *Mr. Edmund Curtis* was on their brief.

*Mr. Attorney General* and *Mr. Solicitor General* for defendant in error.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

This case raises the question of the constitutionality of the

Foraker act, so far as it fixes the duties to be paid upon merchandise imported into Porto Rico from the port of New York. The validity of this requirement is attacked upon the ground of its violation of that clause of the Constitution (Art. I, sec. 9) declaring that "no tax or duty shall be laid on articles exported from any State."

While the words "import" and "export" are sometimes used to denote goods passing from one State to another, the word "import," in connection with the provision of the Constitution that "no State shall levy any imposts or duties on imports or exports," was held in *Woodruff* v. *Parham*, 8 Wall. 123, to apply only to articles imported from foreign countries into the United States.

That was an action to recover a tax imposed by the city of Mobile for municipal purposes, upon sales at auction. Defendants, who were auctioneers, received in the course of their business for themselves, or as consignees or agents for others, large amounts of goods and merchandise, the products of other States than Alabama, and sold the same in Mobile to purchasers, in unbroken and original packages. The Supreme Court of Alabama decided the case in favor of the tax, and the case came here for review.

The question, as stated by Mr. Justice Miller, was "whether merchandise brought from other States and sold, under the circumstances stated, comes within the prohibition of the Federal Constitution, that no State shall, without the consent of Congress, levy any imposts or duties on imports or exports." Defendants relied largely upon a dictum in *Brown* v. *Maryland*, 12 Wheat. 419, to the effect that the principles laid down in that case as to the non-taxability of imports from foreign countries might perhaps apply equally to importations from a sister State.

In discussing this question, and particularly of the power of Congress to levy and collect taxes, duties, imposts and excises, Mr. Justice Miller observed : " Is the word, 'impost,' here used, intended to confer upon Congress a distinct power to levy a tax upon all goods or merchandise carried from one State to another? Or is the power limited to duties on foreign imports? If the

former be intended, then the power conferred is curiously rendered nugatory by the subsequent clause of the ninth section, which declares that no tax shall be laid on articles exported from any State, for no article can be imported from one State into another which is not at the same time exported from the former. But if we give to the word 'imposts' as used in the first mentioned clause, the definition of Chief Justice Marshall, and to the word 'export' the corresponding idea of something carried out of the United States, we have, in the power to lay duties on imports from abroad, and the prohibition to lay such duties on exports to other countries the power and its limitations concerning imposts."

"It is not too much to say that, so far as our research has extended, neither the word 'export,' 'import' or 'impost' is to be found in the discussion on this subject, as they have come down to us from that time, in reference to any other than foreign commerce, without some special form of words to show that foreign commerce is not meant. Whether we look, then, to the terms of the clause of the Constitution in question, or to its relation to other parts of that instrument, or to the history of its formation and adoption, or to the comments of the eminent men who took part in those transactions, we are forced to the conclusion that no intention existed to prohibit, by this clause," (that no State shall, without the consent of Congress, levy any impost or duty upon any export or import,) "the right of one State to tax articles brought into it from another." This definition of the word impost was afterwards approved in *Brown* v. *Houston*, 114 U. S. 622. See also *Fairbank* v. *United States*, 181 U. S. 283.

It follows, and is the logical sequence of the case of *Woodruff* v. *Parham*, that the word "export" should be given a correlative meaning, and applied only to goods exported to a foreign country. *Muller* v. *Baldwin*, L. R. 9 Q. B. 457. If, then, Porto Rico be no longer a foreign country under the Dingley act, as was held by a majority of this court in *De Lima* v. *Bidwell*, 182 U. S. 1, and *Dooley* v. *United States*, 182 U. S. 222, we find it impossible to say that goods carried from New York to Porto Rico can be considered as "exported" from New

York within the meaning of that clause of the Constitution. If they are neither exports nor imports, they are still liable to be taxed by Congress under the ample and comprehensive authority conferred by the Constitution " to lay and collect taxes, duties, imposts and excises." Art. 1, sec. 8.

In another view, however, the case presented by the record is, whether a duty laid by Congress upon goods arriving at Porto Rico from New York is a duty upon an export from New York, or upon an import to Porto Rico. The fact that the duty is exacted upon the arrival of the goods at San Juan certainly creates a presumption in favor of the latter theory. At the same time it is possible that it may also be a duty upon an export. The mere fact that the duty is not laid at the port of departure is by no means decisive against its being such. It is too clear for argument that if vessels bound for a foreign country were compelled to stop at an intermediate port and pay into the Treasury of the United States a duty upon their cargoes, such duty would be a tax upon an export, and the place of its exaction would be of little significance. The manner in which and the place at which the tax is levied are of minor consequence. Thus in *Brown* v. *Maryland*, 12 Wheat. 419, it was held that an act of a state legislature requiring importers of foreign goods to take out a license was a violation of the Constitution declaring that no State shall, without the consent of Congress, lay an impost or duty on imports or exports; and in the recent case of *Fairbank* v. *United States*, 181 U. S. 283, we held that a discriminating stamp tax upon bills of lading, covering goods to be carried to a foreign country, was a tax upon exports within the same provision of the Constitution.

One thing, however, is entirely clear. The tax in question was imposed upon goods imported into Porto Rico, since it was exacted by the collector of the port of San Juan after the arrival of the goods within the limits of that port. From this moment the duties became payable as upon imported merchandise. *United States* v. *Howell*, 5 Cranch, 368; *Arnold* v. *United States*, 9 Cranch, 104; *Meredith* v. *United States*, 13 Pet. 486. Now while an import into one port almost necessarily involves a prior export from another, still, in determining the character

of the tax imposed, it is important to consider whether the duty be laid for the purpose of adding to the revenues of the country from which the export takes place, or for the benefit of the territory into which they are imported. By the third section of the Foraker act imposing duties upon merchandise coming into Porto Rico from the United States, it is declared that "whenever the legislative assembly of Porto Rico shall have enacted and put into operation a system of local taxation to meet the necessities of the government of Porto Rico, by this act established, and shall by resolution duly passed so notify the President, he shall make proclamation thereof, and thereupon all tariff duties on merchandise and articles going into Porto Rico from the United States or coming into the United States from Porto Rico shall cease, and from and after such date all such merchandise and articles shall be entered at the several ports of entry free of duty." And by section four, "the duties and taxes collected in Porto Rico in pursuance of this act, less the cost of collecting the same, and the gross amount of all collections and taxes in the United States upon articles of merchandise coming from Porto Rico, shall not be covered into the general fund of the Treasury, but shall be held as a separate fund, and shall be placed at the disposal of the President to be used for the government and benefit of Porto Rico until the government of Porto Rico, herein provided for, shall have been organized, when all moneys theretofore collected under the provisions hereof, then unexpended, shall be transferred to the local treasury of Porto Rico."

Now, there can be no doubt whatever that, if the legislative assembly of Porto Rico should, with the consent of Congress, lay a tax upon goods arriving from ports of the United States, such tax, if legally imposed, would be a duty upon imports to Porto Rico, and not upon exports from the United States; and we think the same result must follow, if the duty be laid by Congress in the interest and for the benefit of Porto Rico. The truth is, that, in imposing the duty as a temporary expedient, with a proviso that it may be abolished by the legislative assembly of Porto Rico at its will, Congress thereby shows that it is undertaking to legislate for the island for the time being

and only until the local government is put into operation. The mere fact that the duty passes through the hands of the revenue officers of the United States is immaterial, in view of the requirement that it shall not be covered into the general fund of the Treasury, but be held as a separate fund for the government and benefit of Porto Rico.

The action is really correlative to that of *Downes* v. *Bidwell,* 182 U. S. 244, in which we held that Congress could lawfully impose a duty upon imports from Porto Rico, notwithstanding the provision of the Constitution that all duties, imposts and excises shall be uniform throughout the United States. It is true that this conclusion was reached by a majority of the court by different processes of reasoning, but it is none the less true that in the conclusion that certain provisions of the Constitution did apply to Porto Rico, and that certain others did not, there was no difference of opinion.

It is not intended by this opinion to intimate that Congress may lay an export tax upon merchandise carried from one State to another. While this does not seem to be forbidden by the express words of the Constitution, it would be extremely difficult, if not impossible, to lay such a tax without a violation of the first paragraph of Art. 1, sec. 8, that "all duties, imposts and excises shall be uniform throughout the United States." There is a wide difference between the full and paramount power of Congress in legislating for a territory in the condition of Porto Rico and its power with respect to the States, which is merely incidental to its right to regulate interstate commerce. The question, however, is not involved in this case, and we do not desire to express an opinion upon it.

These duties were properly collected, and the action of the Circuit Court in sustaining the demurrer to the complaint was correct, and it is therefore

*Affirmed.*

Mr. Justice White, concurring:

Whilst agreeing to the judgment of affirmance and in substance concurring in the opinion of the court just announced, by

which the affirmance is sustained, I propose to summarize in my own language the reasoning which the opinion embodies as it. is by me understood.

In my judgment the opinion of the court in the cases of *De Lima* v. *Bidwell*, 182 U. S. 1, and *Dooley* v. *United States*, 182 U. S. 222, decided in the last term, and that just announced in the case of *The Diamond Rings*, as well as the opinions of the majority of the members of the court in *Downes* v. *Bidwell*, 182 U. S. 244, also decided at the last term, when considered in connection with the previous adjudications of this court, are conclusive in favor of the affirmance of the judgment in this cause. The question is, whether a tax imposed by authority of the act of April 12, 1900, 31 Stat. 77, in Porto Rico, on merchandise coming into that island from the United States, is repugnant to clause 5, section 9, of Article I of the Constitution of the United States, which provides that " no tax or duty shall be laid on articles exported from any State." Is the tax here assailed an export tax within the meaning of the Constitution ? If it is, the judgment sustaining it should be reversed ; if it is not, affirmance is required.

In *Woodruff* v. *Parham* (1870), 8 Wall. 123, the validity of a tax on auction sales levied by the city of Mobile pursuant to authority conferred by the laws of the State of Alabama was called in question. One of the contentions was that, as the tax was on sales at auction of goods in the original packages brought into the State of Alabama from other States, it was repugnant to that clause of section 9 of article I of the Constitution, which forbids any State, without the consent of Congress, from laying imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws. In approaching the consideration of the question thus presented, the court, in its opinion, which was announced by Mr. Justice Miller, said, p. 131 :

" The words imposts, imports and exports are frequently used in the Constitution. They have a necessary co-relation, and when we have a clear idea of what either word means in any particular connection in which it may be found, we have one of the most satisfactory tests of its definition in other parts of the same

instrument. . . . Leaving, then, for a moment, the clause of the Constitution under consideration," (forbidding a State to lay an import or an export tax,) " we find the first use of these co-relative terms in that clause of the eighth section of the first article which begins the enumeration of the powers confided to Congress, 'that Congress shall have power to levy and collect taxes, duties, imposts and excises. . . . But all duties, imposts and excises shall be uniform throughout the United States.' Is the word impost, here used, intended to confer upon Congress a distinct power to levy a tax upon all goods or merchandise carried from one State into another? Or is the power limited to duties on foreign imports? If the former be intended, then the power conferred is curiously rendered nugatory by the subsequent clause of the ninth section, which declares that no tax shall be laid on articles exported from any State, for no article can be imported from one State into another which is not, at the same time, exported from the former. But if we give to the word imposts, as used in the first-mentioned clause, the definition of Chief Justice Marshall, and to the word export the corresponding idea of something carried out of the United States, we have, in the power to lay duties on imports from abroad and the prohibition to lay such duties on exports to other countries, the power and its limitation concerning imposts."

The opinion then proceeded to elaborately consider the meaning of the words imports, exports and imposts in the Constitution, with reference to the powers of Congress, and concluded that they related only to the bringing in of goods from a country foreign to the United States or the taking out of goods from the United States to such a country. From this conclusion the deduction was drawn that the words imports and exports, when used in the Constitution with reference to the power of the several States, had a similar meaning, and hence the tax levied by the city of Mobile was decided not to be repugnant to the clause of the Constitution heretofore referred to, prohibiting a State " from laying imposts or duties on imports or exports." In the course of the opinion an intimation of Mr. Chief Justice Marshall in *Brown* v. *Maryland*, that the words imports and

exports might relate to the movement of goods between the States, was referred to, and it was expressly said that this was a mere suggestion on the part of the Chief Justice, not involved in the cause, and not therefore decided. So, also, the attention of the court was directed to the case of *Almy* v. *California*, (1860), 24 How. 169. That case involved the validity of a stamp tax imposed in California on all bills of lading for the shipment of gold from California to a point without the State. The particular bill of lading which was in question was for the shipment of gold from California to New York. It was held that this stamp tax was at least an indirect burden on exports, and hence was void, because an export tax within the meaning of the Constitution. In the opinion in *Woodruff* v. *Parham*, it was expressly decided that, although the conclusion in *Almy* v. *California* that the tax was void, was sustained by the commerce clause of the Constitution which had been referred to in the argument of that case, it had been erroneously held that import or export within the constitutional sense of the words related to the movement of goods between the States and not exclusively to foreign commerce. To the extent therefore that *Almy* v. *California*, held or intimated that an export or import tax within the meaning of the Constitution embraced anything but foreign commerce, it was expressly overruled.

In *Brown* v. *Houston*, 114 U. S. 622, decided in 1884, fourteen years after the decision in *Woodruff* v. *Parham*, the question which arose in the latter case was again presented. A tax levied by the State of Louisiana on certain coal which had come down the Ohio River was assailed on the ground that it amounted to both an export and import tax within the meaning of the Constitution. The court, speaking through Mr. Justice Bradley, said (p. 628):

"It was decided by this court in the case of *Woodruff* v. *Parham*, 8 Wall. 123, that the term imports as used in that clause of the Constitution which declares that ' no State shall without the consent of Congress lay any imposts or duties on imports or exports,' does not refer to articles carried from one State into another, but only to articles imported from foreign countries into the United States."

MR. JUSTICE WHITE, concurring.

The opinion, after stating the facts which were presented in *Woodruff* v. *Parham*, and the contention which was in that case based upon them, said (pp. 628, 629):

"This court, however, after an elaborate examination of the question, held that the terms 'imports' and 'exports' in the clause under consideration had reference to goods brought from or carried to foreign countries alone and not to goods transported from one State to the other. It is unnecessary, therefore, to consider further the question raised by the plaintiffs in error under their assignment of error so far as it is based on the assumption that the tax complained of was an impost or duty on imports."

Thus treating the meaning of the words imports and exports as having been conclusively determined by *Woodruff* v. *Parham*, the court passed to the consideration of the contention that the tax levied in the State of Louisiana was an export tax within the meaning of the Constitution, because some of the coal was intended for export to a foreign country, or had been, as it was claimed, in part actually exported to such country.

Again, in *Fairbank* v. *United States*, (1900) 181 U. S. 283, the court was called upon to determine whether the requirement in an act of Congress that a revenue stamp be affixed to every bill of lading for goods shipped to a foreign country was a tax on exports. In the course of the opinion, in considering the question, the court referred to *Almy* v. *California, supra,* as authority for the proposition that a tax on the bill of lading was a tax on the movement of the goods which the bill of lading evidenced. But, in referring to the *Almy* case, the court was careful to say (p. 294):

"It is true that thereafter in *Woodruff* v. *Parham*, 8 Wall. 123, it was held that the words 'imports' and 'exports,' as used in the Constitution, were used to define the shipment of articles between this and a foreign country and not that between the States, and while therefore that case is no longer an authority as to what is or what is not an export, the proposition that a stamp duty on a bill of lading is in effect a duty on the article transported remains unaffected."

A consideration of the opinons in *Woodruff* v. *Parham* and

*Brown* v. *Houston*, so recently in effect approved by this court in the case of *Fairbank* v. *United States*, will make it clear that an adherence to the interpretation of the words export and import which was expounded in those cases is essential to the preservation of the necessary powers of taxation of the several States, as well as of those of the government of the United States. And, by implication, in a number of cases decided by this court since the decision in *Woodruff* v. *Parham*, the doctrine of export and import there defined has been, if not expressly, at least tacitly, approved in many ways. Indeed, it may be safely assumed that many state statutes levying taxes and much legislation of Congress has been enacted upon the express or implied recognition of the settled construction of the Constitution hitherto affixed to the import and export clauses by this court in the cases referred to. And this will be made obvious when it is considered that if the words export and import as used in the Constitution be applied to the movement of goods between the States, then it amounts to not only an express prohibition on the States to impose any direct but also any indirect burden, and, therefore, under the doctrine of *Brown* v. *Maryland*, any state tax law which would indirectly burden the coming of goods from one State to the other would be wholly void. So also, as to the government of the United States, if the provision as to the laying and collection of imposts be not construed as a "distinct" provision relating to foreign commerce and co-related with the clause as to exports, it would follow, as was clearly pointed out in *Woodruff* v. *Parham*, that the Constitution had granted on the one hand a power and immediately denied it. Besides, it would follow that all the general powers of taxation conferred upon Congress would be limited by the export clause, and thus any domestic tax, although fulfilling the requirements of uniformity and not violating the prohibition against preferences which indirectly burdened the ultimate export, would be void, a doctrine which would manifestly cause to be invalid methods of taxation exercised by Congress from the beginning without question.

It being then beyond doubt that this court has, in a line of well-considered cases, determined that the words export and

import when employed in the Constitution relate to the bringing in of goods from a country foreign to the United States and to the carrying out of goods from the United States to such a country, the only question remaining is, Is Porto Rico a country foreign to the United States? In answering this question it is manifest, from the entire reasoning of the court, in the cases in which it was decided that the terms export and import relate to a foreign country alone, that the words foreign country, as used in those opinions, signified a country outside of the sovereignty of the United States and beyond its legislative authority, and that such meaning of those words was absolutely essential to the process of reasoning by which the conclusion in the cases referred to was reached.

Is Porto Rico a country foreign to the United States in the sense that it is not within the sovereignty and not subject to the legislative authority of the United States, is then the issue. In *De Lima* v. *Bidwell* and *Dooley* v. *United States, supra*, it was held that instantly upon the ratification of the treaty with Spain, Porto Rico ceased to be a foreign country within the meaning of the tariff laws of the United States. In *Fourteen Diamond Rings, post,* 176, it has just been held that the Philippine Islands immediately upon the ratification of the treaty ceased to be foreign country within the meaning of the tariff laws; and of course, as these islands were acquired by the same treaty by which Porto Rico was acquired, this ruling is predicated on the decisions in *De Lima* and *Dooley,* above referred to. It is true that both in the *De Lima* and the *Dooley* cases, as well as in the case of *The Diamond Rings,* just decided, dissents were announced. None of the dissents rested, however, upon the theory that Porto Rico or the Philippine Islands had not come under the sovereignty and become subject to the legislative authority of the United States, but were based on the ground that legislation by Congress was necessary to bring the territory within the line of the tariff laws in force at the time of the acquisition; and especially was this the case where the new territory had not, as the result of the acquisition, been incorporated into the United States as an integral part thereof, though com-

ing under its sovereignty and subject, as a possession, to the legislative power of Congress.

In *Downes* v. *Bidwell*, 182 U. S. 244, the question was whether a tax imposed by Congress on goods coming into the United States from Porto Rico was repugnant to that clause of the Constitution requiring uniformity "throughout the United States" of all "duties, imposts and excises." The contention on the one hand was, that as Porto Rico had by the treaty with Spain been acquired by the United States, Congress could not impose a burden on goods coming from Porto Rico, in disregard of the requirement of uniformity "throughout the United States." On the other hand, it was contended that although Porto Rico had become territory of the United States and was subject to the legislative authority of Congress, it had not been so made a part of the United States as to cause Congress to be subject, in legislating in regard to that island, to the uniformity provision of the Constitution. The court maintained the latter view. Whilst it is true that the members of the court who agreed in this conclusion did so for different reasons, nevertheless, in all the opinions delivered by the Justices who formed the majority of the court, it was declared that Porto Rico had come under the sovereignty and was subject to the legislative authority of the United States. Indeed, this was controverted by no one, since the members of the court who dissented did so because they deemed that Porto Rico had so entirely ceased to be foreign country and had so completely been made a part of the United States, that Congress could not, in legislating for that island, disregard the provision of uniformity throughout the United States.

It having been thus affirmatively repeatedly determined that the export and import clauses of the Constitution refer only to commerce with foreign countries, that is, to a country or countries without the sovereignty and entirely beyond the legislative authority of the United States, and it having been conclusively settled that Porto Rico is not such a country, it seems to me the claim here made that the tax imposed by Congress in Porto Rico is an export or an import within the meaning of the Constitution, is untenable. But, it is said, if Porto Rico is

not foreign, and, therefore, the tax laid on goods in that island on their arrival from the United States is not within the purview of the import and the inhibition of the export clauses of the Constitution, then Porto Rico is domestic, and the tax is void because repugnant to the first clause of section 8 of article I of the Constitution conferring upon Congress "the power to lay and collect taxes, duties, imposts and excises, . . . but all duties, imposts and excises shall be uniform throughout the United States." This contention, however, is but a restatement of the proposition which the court held to be unsound in *Downes* v. *Bidwell;* for, in that case, it was expressly decided that a provision of the statute now in question which imposes a tax on goods coming to the United States from Porto Rico was valid because that island occupied such a relation to the United States as empowered Congress to exact such a tax, since requirement of uniformity throughout the United States was inapplicable. I do not propose to recapitulate the grounds of the conclusion so elaborately expressed by the opinions of the majority of the court in that case, since it suffices to say, for the purposes of the uniformity clause, that that decision is controlling in this case. If the contention be that because the impost clause of the Constitution refers only to foreign commerce, therefore there was no power in Congress to impose the tax in question, or that such power is impliedly denied, the contention is unfounded, and really but amounts to an indirect attack upon the doctrines announced in *Woodruff* v. *Parham, Brown* v. *Houston* and *Fairbank* v. *United States.* As held in *Woodruff* v. *Parham,* the impost clause and the export clause are correlated and refer to a distinct subject, that is, foreign commerce. By what process of reasoning it can be said that because a special enumeration on a particular subject of taxation and a particular limitation as to that subject is expressed in the Constitution, therefore other and general powers of taxation not relating to the subject in question are taken away, is not by me perceived. Certainly the argument cannot be that because a power has been conferred on Congress by the Constitution to levy a tax on foreign commerce, therefore the Constitution has taken away from Congress power to tax even indirectly domestic commerce. Be-

cause the grant of power as to imposts contained in the first clause of section 8 of article I of the Constitution relates to foreign commerce there arises no limitation on the general authority to tax as to all other subjects, which flow from the other provisions of the same clause. Referring to such power—the authority to levy and collect taxes, duties, imposts and excises —the court, in the *License Tax Cases*, (1866) 5 Wall. 462, 471, said:

"The power of Congress to tax is a very extensive power. It is given in the Constitution, with only one exception and only two qualifications. Congress cannot tax exports, and it must impose direct taxes by the rule of apportionment, and indirect taxes by the rule of uniformity. Thus limited, and thus only, it reaches every subject, and may be exercised at discretion."

Of course, the Constitution contemplates freedom of commerce between the States, but it also confers upon Congress the powers of taxation to which I have referred, and safeguards the freedom of commerce and equality of taxation between the States by conferring upon Congress the power to regulate such commerce, by providing for the apportionment of direct taxes, by exacting uniformity throughout the United States in the laying of duties, imposts and excises, and by prohibiting preferences between ports of different States. Indeed, when the argument which I am considering is properly analyzed, it amounts to a denial, as I have said, of the substantial powers of Congress with regard to domestic taxation, and, as I understand it, overthrows the settled interpretation of the Constitution, long since announced and consistently adhered to.

MR. CHIEF JUSTICE FULLER, with whom concurred MR. JUSTICE HARLAN, MR. JUSTICE BREWER and MR. JUSTICE PECKHAM, dissenting:

This is an action brought to recover back duties levied and collected under the Porto Rican act of April 12, 1900, 31 Stat. 77, at San Juan, on articles shipped to that port by citizens of New York from the State of New York. Plaintiffs were en-

FULLER, C. J., HARLAN, BREWER and PECKHAM, JJ., dissenting.

gaged in the business of commission merchants, having their main office in the city of New York and a branch office at San Juan.

The second section of the act provides that, from the time of its passage, " the same tariffs, customs, and duties shall be levied, collected, and paid upon all articles imported into Porto Rico from ports other than those of the United States which are required by law to be collected upon articles imported into the United States from foreign countries," with some exceptions not material here.

The third section, by which these duties are imposed, reads : " That on and after the passage of this act all merchandise coming into the United States from Porto Rico and coming into Porto Rico from the United States shall be entered at the several ports of entry upon payment of fifteen per centum of the duties which are required to be levied, collected, and paid upon like articles of merchandise imported from foreign countries ; and in addition thereto upon articles of merchandise of Porto Rican manufacture coming into the United States and withdrawn for consumption or sale upon payment of a tax equal to the internal revenue tax imposed in the United States upon the like articles of merchandise of domestic manufacture ; " and it was further provided that articles of merchandise manufactured in the United States coming into Porto Rico should, after entry, be subject to whatever internal revenue taxes might be in force on the island. And also that whenever the legislative assembly of Porto Rico should have enacted and put into operation a system of local taxation, and proclamation thereof had been made, " all tariff duties on merchandise and articles going into Porto Rico from the United States or coming into the United States from Porto Rico shall cease."

Assuming that " the United States " as referred to is the United States as constituted at the date of the proclamation of the treaty, the act, explicitly recognizing the distinction between tariff duties and internal taxes, is in respect of such duties an act to raise revenue by taxing the commerce of the people of every State and Territory.

The fact that the net proceeds of the duties are appropriated

by the act for use in Porto Rico does not affect their character any more than if so appropriated by another and separate act. The taxation reaches the people of the States directly, and is national and not local, even though the revenue derived therefrom is devoted to local purposes.

Customs duties are duties imposed on imports or exports, and, according to the terms of this act, these are customs duties, not levied according to the rule of uniformity, and laid on exports as well as imports.

By the first clause of section 8 of Article I of the Constitution, Congress is empowered to lay and collect duties, imposts and excises, subject to the rule of uniformity, but this court has held that customs duties are only leviable on foreign commerce, *Woodruff* v. *Parham*, 8 Wall. 123, and that the uniformity required is geographical merely, *Knowlton* v. *Moore*, 178 U. S. 41. By the third clause of the same section, Congress is empowered " to regulate commerce with foreign nations, and among the several States, and with the Indian tribes." The power to tax and the power to regulate commerce are distinct powers, yet the power of taxation may be so exercised as to operate in regulation of commerce.

Clauses 5 and 6 of section 9 provide:

" No tax or duty shall be laid on articles exported from any State.

" No preference shall be given by any regulation of commerce or revenue to the ports of one State over those of another; nor shall vessels bound to or from one State be obliged to enter, clear or pay duties in another."

These provisions were intended to prevent the application of the power to lay taxes or duties, or the power to regulate commerce, so as to discriminate between one part of the country and another. The regulation of commerce by a majority vote and the exemption of exports from duties or taxes were parts of one of the great compromises of the Constitution.

If, after the cession, Porto Rico remained a foreign country, the prohibition of clause 5 would be fatal to these duties; while if Porto Rico became domestic, then, as they are customs duties, they could not be sustained, according to *Woodruff* v. *Parham*,

under the first clause of section 8; and were also prohibited by clause 5 of section 9, whether customs duties or not, if the application of that clause is not limited to foreign commerce.

The prohibition, that "no tax or duty shall be laid on articles exported from any State," negatives the existence of any power in Congress to lay taxes or duties in any form on articles exported from a State, *irrespective of their destination*, and, this being so, the act in imposing the duties in question is invalid, whether Porto Rico, after its passage, was a foreign or reputed foreign territory, a domestic Territory, or a territory subject to be dealt with at the will of Congress regardless of constitutional limitations.

Confessedly the prohibition applies to foreign commerce, and the question is whether it is confined to that. In other words, whether language which embraces all articles exported can be properly restricted to particular exports. On what ground can the insertion in this comprehensive denial of power of the words "to foreign countries," thereby depriving it of effect on commerce other than foreign, be justified?

If the words "exported from any State" apply only to articles exported from a State to a foreign country, it would seem to follow that the broad power granted to Congress "to lay and collect taxes," for the purposes specified in the Constitution, may be exerted in the way of taxation on articles exported from one State to another. The right to carry legitimate articles of commerce from one State to another State without interference by national or state authority was, it has always been supposed, firmly established and secured by the Constitution. But that right may be destroyed or greatly impaired if it be true that articles may be taxed by Congress by reason of their being carried from one State to another.

Undoubtedly the clause confines the power to lay customs duties or imposts to imports only. This was so stated by Mr. Hamilton in the thirty-second number of The Federalist: "The first clause of the same section [§ 8] empowers Congress '*to lay and collect taxes, duties, imposts, and excises;*' and the second clause of the tenth section of the same article declares that '*no State shall, without the consent of Congress lay any imposts or*

*duties on imports or exports*, except for the purpose of execut-ing its inspection laws.' Hence would result an exclusive power in the Union to lay duties on imports and exports, with the particular exception mentioned. But this power is abridged by another clause, which declares that no tax or duty shall be laid on articles exported from any State; in consequence of which qualification it now only extends to the *duties on im-ports.*"

Nevertheless because the clause secured that object, it is not to be assumed that it was not also intended to secure unre-strained intercourse between the different parts of a common country.

As was said in *Gibbons* v. *Ogden*, the right of intercourse be-tween State and State was derived "from those laws whose authority is acknowledged by civilized man throughout the world. The Constitution found it an existing right, and gave to Congress the power to regulate it." 9 Wheat. 1, 211. From this grant, however, the power to regulate by the levy of any tax or duty on articles exported from any State was expressly withheld.

In *Woodruff* v. *Parham*, 8 Wall. 123, 132, Mr. Justice Miller, in support of the conclusion that clause 1 of section 8 was con-fined as to customs duties to foreign commerce, said: "Is the word impost, here used, intended to confer upon Congress a distinct power to levy a tax upon all goods or merchandise carried from one State into another? Or is the power limited to duties on foreign imports? If the former be intended, then the power conferred is curiously rendered nugatory by the sub-sequent clause of the ninth section, which declares that no tax shall be laid on articles exported from any State, for no article can be imported from one State into another which is not, at the same time, exported from the former."

In that case, clause 2 of section 10 was under consideration: "No State shall, without the consent of Congress, lay any im-posts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws; and the net produce of all duties and imposts, laid by any State on im-ports or exports, shall be for the use of the Treasury of the

United States; and all such laws shall be subject to the revision and control of the Congress."

It was held that this referred to foreign commerce only, and " that no intention existed to prohibit, *by this clause,* the right of one State to tax articles brought into it from another." This was reaffirmed in *Brown* v. *Houston,* 114 U. S. 622, 630, and Mr. Justice Bradley said: " But in holding with the decision in *Woodruff* v. *Parham,* that goods carried from one State to another are not imports or exports within the meaning of the clause which prohibits a State from laying any impost or duty on imports or exports, we do not mean to be understood as holding that a State may levy import or export duties on goods imported from or exported to another State. We only mean to say that the clause in question does not prohibit it. Whether the laying of such duties by a State would not violate some other provision of the Constitution, that, for example, which gives to Congress the power to regulate commerce with foreign nations, among the several States, and with the Indian tribes, is a different question."

That question has been repeatedly answered by this court to the effect " that no State has the right to lay a tax on interstate commerce in any form, whether by way of duties laid on the transportation of the subjects of that commerce, or on the receipts derived from that transportation, or on the occupation or business of carrying it on, for the reason that such taxation is a burden on that commerce, and amounts to a regulation of it, which belongs solely to Congress." *Lyng* v. *Michigan,* 135 U. S. 161, 166. But if that power of regulation is absolutely unrestricted as respects interstate commerce, then the very unity the Constitution was framed to secure can be set at naught by a legislative body created by that instrument.

Such a conclusion is wholly inadmissible. The power to regulate interstate commerce was granted in order that trade between the States might be left free from discriminating legislation and not to impart the power to create antagonistic commercial relations between them.

The prohibition of preference of ports was coupled with the prohibition of taxation on articles exported. The citizens of

each State were declared "entitled to all privileges and immunities of citizens in the several States," and that included the right of ingress and egress, and the enjoyment of the privileges of trade and commerce. *Slaughter House Cases*, 16 Wall. 36.

And so the court, in *Woodruff* v. *Parham*, as the quotation from its opinion by Mr. Justice Miller demonstrates, did not put upon the absolute and general prohibition of power to lay any tax or duty on articles exported from any State that narrow construction which would limit it to exports to a foreign country, and would concede the power to Congress to impose duties on exports from one State to another in regulation of interstate commerce.

The power to lay duties in regulation of commerce with foreign nations is relied on as the source of power to pass laws for the protection and encouragement of domestic industries, and except for this clause the same, effect would be attributed to the power to regulate commerce among the States. This, however, the clause, literally read, prevents, and to limit its application to foreign commerce, as the power to lay customs duties under the first clause of section 8 has been limited, would defeat the manifest purpose of the Constitution by enabling discriminating taxes and duties to be laid against one section of the country as distinguished from another.

And if the prohibition be not confined to foreign commerce then it applies to all commerce, not wholly internal to the respective States, and the destination of articles exported from a State cannot affect, or be laid hold of to affect, the result.

In short, clause 5 operates, and was intended to operate, to except the power to lay any tax or duty on articles exported from the general power to regulate commerce whether interstate or foreign. And this is equally true in respect of commerce with the territories, for the power to regulate commerce includes the power to regulate it not only as between foreign countries and the territories, but also by necessary implication as between the States and Territories. *Stoutenburgh* v. *Hennick*, 129 U. S. 141.

Nothing is better settled than that the States cannot interfere with interstate commerce, yet it is easy to see that if the

exclusive delegation to Congress of the power to regulate commerce did not embrace commerce between the States and Territories, the interference by the States with such commerce might be justified.

Again, if, in any view, these duties could be treated as other than custom duties, the result would be the same, inasmuch as the goods were articles exported from New York, and there was a total lack of power to lay *any* tax or duty on such articles.

The prohibition on Congress is explicit, and noticeably different from the prohibition on the States. The State is forbidden to lay "any imposts or duties;" Congress is forbidden to lay "any tax or duty." The State is forbidden from laying imposts or duties "on imports or exports," that is, articles coming into or going out of the United States. Congress is forbidden to tax "articles exported *from any State.*"

The plain language of the Constitution should not be made "blank paper by construction," and its specific mandate ought to be obeyed.

As said in *Marbury* v. *Madison,* "It is declared that 'no tax or duty shall be laid on articles exported from any State.' Suppose a duty on the export of cotton, of tobacco, or of flour; and a suit instituted to recover it. Ought judgment to be rendered in such a case? Ought the judges to close their eyes on the Constitution, and only see the law?" 1 Cranch, 137, 178.

Nor is the result affected by the fact that the collection of these duties was at Porto Rico.

In *Brown* v. *Maryland,* 12 Wheat. 419, 437, Chief Justice Marshall said: "An impost, or duty on imports, is a custom or a tax levied on articles brought into a country, and is most usually secured before the importer is allowed to exercise his rights of ownership over them, because evasions of the law can be prevented more certainly by executing it while the articles are in its custody. It would not, however, be less a duty or impost on the articles, if it were to be levied on them after they were landed. The policy and consequent practice of levying or securing the duty before, or on entering, the port, does not limit the power to that state of things, nor, consequently, the pro-

hibition, unless the true meaning of the clause so confines it. What, then, are 'imports?' The lexicons inform us they are 'things imported.' If we appeal to usage for the meaning of the word, we shall receive the same answer. They are the articles themselves which are brought into the country. 'A duty on imports,' then, is not merely a duty on the act of importation, but is a duty on the thing imported. It is not, taken in its literal sense, confined to a duty levied while the article is entering the country, but extends to a duty levied after it has entered the country."

And so of exports. They are the things exported—the articles themselves. A duty on exports is not merely a duty on the act of exportation, but is a duty on the article exported, and the article exported remains such until it has reached its final destination. The place of collection is purely incidental, and immaterial on the question of power.

But we are told that these duties were laid, not on articles exported from the State of New York, but on articles imported into Porto Rico. The language used, however, precludes this contention, and there is nothing in the act to indicate that at some particular point on a voyage articles exported were to cease to be such and to become imports, and nothing in the facts in this case to indicate a sea change of that sort as to these goods. The geographical origin of the shipment controls, and, as heretofore said, it is not material whether the duties were collectible at the place of exportation or at Porto Rico. They were imposed on articles exported from the State of New York, and before the articles had reached their ultimate destination and been mingled with the common mass of property on the island.

Chief Justice Marshall disposed of the suggested evasion thus: "Suppose revenue cutters were to be stationed off the coast for the purpose of levying a duty on all merchandise found in vessels which were leaving the United States for foreign countries; would it be received as an excuse for this outrage were the government to say that exportation meant no more than carrying goods out of the country, and as the prohibition to lay a tax on imports, or things imported, ceased the

instant they were brought into the country, so the prohibition to tax articles exported ceased when they were carried out of the country." 12 Wheat. 445.

There is no difference in principle between the case supposed and that before us. The course of transportation is arrested until the exaction is paid.

The proposition that because the proceeds of these duties were to be used for the benefit of Porto Rico they might be regarded as if laid by Porto Rico itself with the consent of Congress, and were, therefore, lawful, will not bear examination. No money can be drawn from the Treasury except in consequence of appropriations made by law. This act does not appropriate a fixed sum for the benefit of Porto Rico, but provides that the money collected, and collected from citizens of the United States in every port of the United States, shall be placed in a separate fund or subsequently in the treasury of Porto Rico, to be expended for the government and benefit thereof. And although the destination of the proceeds in this way were lawful, it would not convert duties on articles exported from the States into local taxes.

States may, indeed, under the Constitution, lay duties on foreign imports and exports, for the use of the Treasury of the United States, with the consent of Congress, but they do not derive the power from the general government. The power preëxisted, and it is its exercise only that is subjected to the discretion of Congress.

Congress may lay local taxes in the Territories, affecting persons and property therein, or authorize territorial legislatures to do so, but it cannot lay tariff duties on articles exported from one State to another, or from any State to the Territories, or from any State to foreign countries, or grant a power in that regard which it does not possess. But the decision now made recognizes such powers in Congress as will enable it, under the guise of taxation, to exclude the products of Porto Rico from the States as well as the products of the States from Porto Rico; and this notwithstanding it was held in De Lima v. Bidwell, 182 U. S. 1, that Porto Rico after the ratification of the

treaty with Spain ceased to be foreign and became domestic territory.

My brothers HARLAN, BREWER and PECKHAM concur in this dissent. We think it clear on this record that plaintiffs were entitled to recover and that the judgment should be reversed.