200 F.3d 1361 (Fed. Cir. 2000)
 CARNIVAL CRUISE LINES, INC., HAL ANTILLEN, N.V., HAL SHIPPING LTD., WIND SURF LIMITED, HOLLAND AMERICA LINE, N.V., and HAL CRUISES LIMITED, Plaintiffs-Appellees,
v.
UNITED STATES, Defendant-Appellant.
United States Court of Appeals for the Federal Circuit
 98-1536
 DECIDED: JANUARY 5, 2000
 
 Appealed from: United States Court of International Trade Senior Judge R. Kenton MusgraveRobert P. Parker, Paul, Weiss, Rifkind, Wharton & Garrison, of Washington, DC, argued for plaintiffs-appellees. With him on the brief were Robert E. Montgomery, Jr., and Aseel M. Rabie.
 Todd M. Hughes, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were David W. Ogden, Acting Assistant Attorney General, and David M. Cohen, Director.
 J. Kevin Horgan, deKieffer & Horgan, of Washington, DC, for amicus curiae Thomson Consumer Electronics, Inc.
 Lawrence M. Friedman, Barnes, Richardson & Colburn, of Chicago, Illinois, for amicus curiae Amoco Oil Company.
 Before MICHEL, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and BRYSON, Circuit Judge.
 FRIEDMAN, Senior Circuit Judge.
 
 
 1
 The United States appeals the decision of the United States Court of International Trade that the application of the Harbor Maintenance Tax ("Harbor Tax"), 26 U.S.C. § 4461, to passengers on cruise ships violates the Export Clause of the United States Constitution, art. I, § 9, cl. 5. Carnival Cruise Lines, Inc. v. United States, 8 F. Supp. 2d 877, 879-80 (Ct. Int'l Trade 1998). We reverse and remand.
 
 
 2
 * A. The Water Resources Development Act of 1986 ("Water Resources Act"), Pub. L. No. 99-662, 100 Stat. 4082 (1986), was a comprehensive statute designed to improve the nation's ports and harbors. The Act included the Harbor Tax as Subchapter A of Title XIV. (Title XIV of the Act was separately entitled the Harbor Maintenance Revenue Act, Pub. L. No. 99-662, tit. XIV, §§ 1401-07, 100 Stat. 4082, 4266-73 (1986)). The Harbor Tax imposes an ad valorem tax upon the operators of commercial vessels for the use of certain ports. It was intended to help fund the harbor improvement programs under the Water Resources Act. The relevant portions of the Harbor Tax provide:
 
 
 3
 (a) General rule
 
 
 4
 There is hereby imposed a tax on any port use.
 
 
 5
 . . .
 
 
 6
 (c) Liability and time of imposition of tax
 
 
 7
 (1) Liability
 
 
 8
 The tax imposed by subsection (a) shall be paid by--
 
 
 9
 (A) in the case of cargo entering the United States, the importer,
 
 
 10
 (B) in the case of cargo to be exported from the United States, the exporter, or
 
 
 11
 (C) in any other case, the shipper.
 
 
 12
 (2) Time of imposition
 
 
 13
 Except as provided by regulations, the tax imposed by subsection (a) shall be imposed(A) in the case of cargo to be exported from the United States, at the time of loading, and
 
 
 14
 (B) in any other case, at the time of unloading.
 
 
 15
 26 U.S.C. § 4461.
 
 
 16
 The statutory definitions for section 4461 include the following:
 
 
 17
 (1) Port use
 
 
 18
 The term "port use" means--
 
 
 19
 (A) the loading of commercial cargo on, or
 
 
 20
 (B) the unloading of commercial cargo from,
 
 
 21
 a commercial vessel at a port.
 
 
 22
 . . .
 
 
 23
 (3) Commercial cargo
 
 
 24
 (A) In general
 
 
 25
 The term "commercial cargo" means any cargo transported on a commercial vessel, including passengers transported for compensation or hire.
 
 
 26
 26 U.S.C. § 4462(a).
 
 
 27
 The statute thus treats "passengers transported for compensation or hire" as part of a vessel's "commercial cargo," which is subject to the Harbor Tax.
 
 
 28
 The Act also includes a severability clause, discussed in part IV, below.
 
 
 29
 B The appellees (collectively "Carnival") own and operate fleets of commercial cruise ships. Since the Harbor Tax became effective in 1987, the Customs Service has been assessing and collecting the tax for all passengers on cruises that originate, stop, or terminate in a port to which the Harbor Tax applies. Carnival protested to the Customs Service the tax on these vessels and, when the Customs Service denied the protest, filed the present suit in the Court of International Trade. See Carnival, 8 F. Supp. 2d at 878. In their second amended complaint Carnival contended that the application of the Harbor Tax to their cruise ships violated the Export Clause of the Constitution, and was also invalid on other grounds. See id. at 878-79.
 
 
 30
 In 1995, prior to the filing of the present case, the Court of International Trade held in another case that, as applied to exports, the Harbor Tax violated the Export Clause. United States Shoe Corp. v. United States, 907 F. Supp. 408 (1995), aff'd, 114 F.3d 1564 (Fed. Cir. 1997). In 1998, the Supreme Court upheld that ruling. United States v. United States Shoe Corp., 523 U.S. 360 (1998) ("U.S. Shoe"). The Court noted that in United States v. International Business Machines Corp., 517 U.S. 843 (1996), it held that "the Export Clause categorically bars Congress from imposing any tax on exports." U.S. Shoe, 523 U.S. at 363. The issue in U.S. Shoe was "whether the Harbor Maintenance Tax . . . as applied to goods loaded at United States ports for export, is an impermissible tax on exports or, instead, a legitimate user fee." Id. The Court held that the Harbor Tax "does not qualify as a permissible user fee," and therefore was a prohibited tax on exports. Id.
 
 
 31
 The Court of International Trade rendered two opinions in the present case. The first, issued while U.S. Shoe was progressing through the appellate process, held that "those portions of the [Harbor Tax] that apply to exports, and are thus unconstitutional in accordance with this Court's opinion in U.S. Shoe . . . are severable from the remainder of the [Harbor Tax], in particular those portions of the statute that involve Plaintiffs' operations." Carnival Cruise Lines, Inc. v. United States, 929 F. Supp 1570, 1577 (Ct. Int'l Trade 1996).
 
 
 32
 In its second opinion, rendered after the Supreme Court's decision in U.S. Shoe, the court granted partial summary judgment that, as applied to passengers, the Harbor Tax violated the Export Clause. Carnival Cruise Lines, Inc. v. United States, 8 F. Supp. 2d 877, 880-81 (Ct. Int'l Trade 1998). The court reasoned that "the statute has equated passengers with cargo, and U.S. Shoe has held that taxing exports, or 'loading,' of cargo violates the Constitution. Therefore, the 'loading' of passengers must also violate the Constitution." Id. at 880.
 
 II
 
 33
 The Export Clause of the Constitution, art. I, § 9, cl. 5, states:
 
 
 34
 No Tax or Duty shall be laid on Articles exported from any State.
 
 
 35
 The Supreme Court's Export Clause jurisprudence has repeatedly recognized that the clause bars a tax on "goods." See, e.g., International Business Machines, 517 U.S. at 846, 848, 849, 855, 862. In U.S. Shoe, the Court stated that in International Business Machines it had "held that the Export Clause allows no room for any federal tax, however generally applicable or nondiscriminatory, on goods in export transit." 523 U.S. at 367; see also Thames & Mersey Marine Ins. Co. v. United States, 237 U.S. 19, 27 (1915); Dooley v. United States, 183 U.S. 151, 154-155 (1901).
 
 
 36
 The passengers on Carnival's cruise ships are neither "articles" nor "goods." They are people. The application of the Harbor Tax to them would not involve the laying of any tax upon "Articles" exported from any state. "Articles" and "goods" relate to items of commerce, not people.
 
 
 37
 To apply the Export Clause to people would be inconsistent with the basic purpose of the Clause. "As a purely historical matter, the Export Clause was originally proposed by delegates to the Federal Convention from the Southern States, who feared that the Northern States would control Congress and would use taxes and duties on exports to raise a disproportionate share of federal revenues from the South." International Business Machines, 517 U.S. at 859 (citing 2 M. Farrand, The Records of the Federal Convention of 1787, at 95, 305-308, 359-363 (rev. ed. 1966)). The Framers sought to "alleviate the fear of northern repression through taxation of southern exports . . . by completely denying to Congress the power to tax exports at all." Id. at 861. The Clause was directed solely against taxation of "exports," i.e., "goods."
 
 
 38
 The provisions of the Harbor Tax statute defining "commercial cargo," the loading or unloading of which constitutes "port use" to which the tax applies, as "including passengers transported for compensation or hire," do not mean that by virtue of such transportation "passengers" become "articles" subject to the Export Clause. These definitional provisions are a common legislative drafting technique for defining the coverage of a statute. It is for Congress to define and determine the coverage of the Harbor Tax; Congress decided to make it applicable to passengers transported for compensation or hire. By defining the reach of the Harbor Tax to cover such passengers, however, Congress could not and did not change the carriage of passengers into the export of goods, which is what the Export Clause covers.
 
 
 39
 Indeed, before this court Carnival does not even attempt to support the Court of International Trade's holding that the Export Clause bars the application of the Harbor Tax to passengers on the cruise ships. Instead, it seeks affirmance of the court's judgment on the alternative ground that the application of the tax to exports that was invalidated in U.S. Shoe as violating the Export Clause cannot be severed from its application to the cruise passengers, and therefore also falls as a result of U.S. Shoe. We now turn to that issue.
 
 III
 
 40
 Before addressing the merits of Carnival's severability argument, we must first consider the antecedent issue whether Carnival may make that argument as an alternative basis for affirming the judgment of the Court of International Trade.
 
 
 41
 A. A preliminary point may be quickly disposed of. Carnival argues that in its second decision the Court of International Trade in fact rejected and overruled its prior decision that the application of the Export Clause to exports is severable from its application to cruise ship passengers. There is nothing in that second opinion, however, that so indicates. To the contrary, prior to discussing the constitutional issue, the court stated that its prior decision "found that the portions of the [Harbor Tax] that applied to exports were unconstitutional and severable from the remainder of the [Harbor Tax]." Carnival, 8 F. Supp. 2d at 879. The court then ruled that "the [Harbor Tax] fees are unconstitutional with respect to transportation services provided to cruise passengers just as cargo was found to be in U.S. Shoe." Id. at 879-80. The court did not even suggest that in so holding it was backing away from its prior severability decision.
 
 
 42
 In a recent opinion, written by another judge, the Court of International Trade ruled that in the first Carnival decision, "the court held that the unconstitutional [Harbor Tax] on exports is severable from the remainder of the [Harbor Tax], in particular those portions of the statute that involve [Carnival's] operations as shippers providing passenger services"; and that despite its subsequent decision that the Harbor Tax "on passenger services is unconstitutional . . . the basic premise that the [Harbor Tax] on exports is severable from the remaining provisions of the [Harbor Tax] is unchanged." Amoco Oil Co. v. United States, No. 99-19, slip op. at 5 & n.5 (Sept 1, 1999). Once again, there was no suggestion that the court's later decision in the present case altered its earlier decision in any way.
 
 
 43
 B. "Absent a cross-appeal, an appellee may 'urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court,' but may not 'attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary.'" El Paso Natural Gas Co. v. Neztsosie, 526 U.S. 473, 119 S. Ct. 1430, 1434-35 (1999) (quoting United States v. American Ry. Express Co., 265 U.S. 425, 435 (1924)). "An argument that would modify the judgment . . . cannot be presented unless a cross-petition has been filed." Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 119 n.14 (1985); see also Radio Steel & Mfg. Co. v. MTD Prods., Inc., 731 F.2d 840, 843, 844 (Fed. Cir. 1984) ("The general rule is that, without taking a cross-appeal, the prevailing party may present any argument that supports the judgment in its favor," except "where the result of acceptance of its argument would be a reversal or modification of the judgment rather than an affirmance.").
 
 
 44
 Under these settled principles, Carnival may argue non-severability as an alternative ground for affirmance of the judgment of the Court of International Trade.
 
 
 45
 The substantive portion of the judgment from which the United States appeals, provided:
 
 
 46
 ORDERED that the Harbor Maintenance Tax is unconstitutional as it applies to cruise ship passengers.
 
 
 47
 Carnival, 8 F. Supp. at 881.
 
 
 48
 Acceptance of Carnival's argument would result in an affirmance of that judgment, not its modification. The application of the Harbor Tax to cruise passengers would still be unconstitutional, as the judgment provides, and that judgment therefore properly would be affirmed. The reason for the conclusion of unconstitutionality would be different from the reason that the Court of International Trade gave; the tax would be unconstitutional not because such application directly violates the Export Clause, but because the application to exports held to violate the Export clause in U.S. Shoe could not be severed from its application to cruise passengers. That different reasoning, however, does not preclude seeking affirmance; an appellee may do so "although his argument may involve an attack upon the reasoning of the lower court." El Paso, 119 S. Ct. at 1435.
 
 
 49
 To be sure, acceptance of Carnival's argument would have consequences beyond the application of the Harbor Tax to cruise passengers. If the Harbor Tax is unseverable and is unconstitutional as applied to exports, it also would appear to be unconstitutional as applied to imports. That issue, however, is irrelevant in determining the standing question before us. The present case involves only the application of the Harbor Tax to cruise passengers, and Carnival's complaint sought relief only with respect to that application.
 
 IV
 
 50
 The Water Resources Act, of which the Harbor Tax is a part, contains a broad severability clause:
 
 
 51
 If any provision of this Act, or the application of any provision of this Act, to any person or circumstance, is held invalid, the application of such provision to other persons or circumstances, and the remainder of this Act, shall not be affected thereby.
 
 
 52
 33 U.S.C. § 2304 (1994).
 
 
 53
 On its face, this provision appears to make the remainder of the Harbor Tax severable from the tax on exports held unconstitutional in U.S. Shoe. The latter "invalidity" holding was "the application of" a "provision of the Act" (the Harbor Tax) to a particular "circumstance" (loading the goods for export); the "application of such provision to other persons or conditions," i.e., to cruise ship passengers, "shall not be affected thereby."
 
 
 54
 Statutory language, however, sometimes is not as simple and clear as it appears. That is the case here. Just as the absence of a severability clause does not make the invalid portion of the statute necessarily non-severable, see Tilton v. Richardson, 403 U.S. 672, 684 (1971) (plurality opinion); United States v. Jackson, 390 U.S. 570, 585 n.27 (1968), the apparently clear facial applicability of such a clause does not end the inquiry. Further analysis must be made under the principle that "'[u]nless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.'" Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 684 (1987) (quoting Buckley v. Valeo, 424 U.S. 1, 108 (1976) (per curiam); Champlin Refining Co. v. Corporation Comm'n of Okla., 286 U.S. 210, 234 (1932)).
 
 
 55
 Supreme Court decisions dealing with the severability of invalid portions of a statute have used various formulations of the appropriate test for deciding the issue. The Court's most recent general discussion was in Alaska Airlines, supra, which summarized and restated the governing principles. We apply those principles rather than the somewhat different formulations set forth in prior Supreme Court opinions, upon which Carnival relies.
 
 
 56
 In Alaska Airlines, the Court stated that "[t]he more relevant inquiry in evaluating severability is whether the statute will function in a manner consistent with the intent of Congress. . . . The final test . . . is the traditional one: the unconstitutional provision must be severed unless the statute created in its absence is legislation that Congress would not have enacted." 480 U.S. at 685. The Court pointed out that it had held in previous cases that
 
 
 57
 the inclusion of such a clause creates a presumption that Congress did not intend the validity of the statute in question to depend on the validity of the constitutionally offensive provision. In such a case, unless there is strong evidence that Congress intended otherwise, the objectionable provision can be excised from the remainder of the statute.
 
 
 58
 Id. at 687 (citations omitted).
 
 
 59
 It cannot be concluded that Congress would not have enacted the remainder of the Harbor Tax had it known that the application of the tax to exports would be invalid. Indeed, in enacting the statute Congress was aware that the Export Clause might bar that application, but it nonetheless decided to cover exports. See H.R. Rep. No. 99-251, pt. 4, at 24 (1985). The Harbor Tax was designed to raise money to help fund the port and harbor improvements provided by the Water Resources Act. The tax would continue to perform that function, although on a lesser scale, even if it did not cover exports. The remaining portions of the Harbor Tax can function effectively and serve their purpose even after the invalid application has been excised. Cf. New York v. United States, 505 U.S. 144, 187 (1992) ("[T]he take title provision may be severed without doing violence to the rest of the Act. The Act is still operative and it still serves Congress' objective of encouraging the States to attain local or regional self-sufficiency in the disposal of low level radioactive waste.").
 
 
 60
 Carnival argues that because the Harbor Tax imposes as a "General rule" a tax on "any port use," Congress "has enacted no specific 'unconstitutional tax on exports' that can be excised from the statute, leaving the remainder intact." According to Carnival, sections 4461(c)(1)(B) and 4461(c)(2)(A), which specify, with respect to exports, who is to pay the tax (the exporter) and when (at the time of loading the cargo), "do not create a separate category of 'export' cargo for tax assessment; rather, they identify the entity responsible for paying the tax, and the time at which the tax is triggered," dealing only with "the mechanics of collection."
 
 
 61
 Carnival asks us, in essence, to read the "General rule" provision in isolation from the remainder of the statute. We decline to do so. The general rule must be read in conjunction with the other statutory provisions, which explain and describe its operation, including the critical provision identifying the entity responsible for paying the tax.
 
 
 62
 Contrary to Carnival's contention, the legislative history of the statute does not show that Congress would not have imposed the Harbor Tax without applying it to exports. Carnival asserts that the history reveals that "Congress' overriding intention was to ensure that all users of specified ports contribute to their development and maintenance in a fair and balanced manner. Exclusion of exports would disrupt this critical statutory balance." None of the legislative history Carnival cites, however, shows that Congress had an "overriding" or "critical" interest in insuring that exports properly contributed their share of the tax. Congress's "overriding intention" in enacting the tax was to provide revenue to fund port and harbor maintenance and improvement projects.
 
 
 63
 Carnival argues that the report of the House Merchant Marine and Fisheries Committee "shows that it took particular care to ensure that the burdens of the tax would be distributed fairly and equitably among the various types of port use." In choosing the basis for assessing the tax, however, the committee was concerned primarily with selecting a method that would not disproportionately burden bulk commodities, which comprised a substantial portion of United States export and domestic shipping. See H.R. Rep. No. 99-251, pt. 4, at 24-26. The committee decided to base the tax on the value of the goods passing through the port (an ad valorem tax) rather than on their volume, because it would have a lower overall impact on domestic shipping and exports. The committee's decision to use an ad valorem tax sheds no light on whether Congress intended the export provisions of the tax to be severable.
 
 
 64
 Carnival also argues that the severability clause does not apply to the Harbor Tax at all. The original bill, H.R. 6, 99th Cong. (1985), contained no severability clause. Four different House committees considered the legislation. Citing concerns over applying the Harbor Tax to exports, see H.R. Rep. 99-251, pt. 4 at 30, one of the four committees, the Merchant Marine and Fisheries Committee, recommended a severability clause, which provided:
 
 
 65
 If section 110 of this title [the Harbor Tax] is invalid, all valid parts that are separable from section 110 remain in effect. If section 110 of this title is invalid in one or more of its applications, section 110 remains in effect in all valid applications that are severable from the invalid applications.
 
 
 66
 Id. at 13.
 
 
 67
 This proposed clause, which applied only to the Harbor Tax, did not appear in the version of the Water Resources Act voted on by the House. While considering the bill on the floor, and without explanation, however, the House substituted for H.R. 6 a revised version of the bill, H.R. 3670, 99th Cong. (1985), which contained a much broader severability clause as a prefatory section of the bill. See 131 Cong. Rec. 30734 (1985). Both the House and Senate versions of the bill contained this broad severability provision. See id.; 132 Cong. Rec. 6250 (1986). The Conference Committee, again without explanation, included the clause in Title IX, the "General provisions" of the Act, along with nearly one hundred other "provisions with general applicability" from both the House and Senate versions of the bill. See Conference Report, H.R. Rep. 99-1013, at 219-20 (1986).
 
 
 68
 Nothing in the legislative history even suggests, much less shows, that Congress intended to eliminate severability for the Harbor Tax when it adopted the broad severability provision rather than the narrower one that the Merchant Marine and Fisheries Committee originally proposed. Indeed, there is no indication that the sponsors of the broad severability clause were even aware of the narrower one the Merchant Marine and Fisheries Committee had drafted. All that appears from the legislative history is that Congress simply decided to include a broad severability clause that covers the entire Water Resources Act.
 
 
 69
 Carnival contends that because the severability clause applies if any provision "of this Act," or its application, is held invalid, it does not cover the Harbor Tax. It states that "[a]lthough the [Water Resources Act] was the legislative vehicle by which the [Harbor Tax] was enacted," the latter "is a free-standing title of the statute, and the port use tax statute has been incorporated as a free-standing subchapter of the Internal Revenue Code." The Water Resources Act contains fourteen titles, the last of which is captioned "Revenue Provisions" and includes as "Subchapter A" the "Harbor Maintenance Tax." That tax is a "provision of this [Water Resources] Act," and the Water Resources Act's severability clause covers it.
 
 
 70
 Carnival also contends, as does the amicus Thompson Consumer Electronics, Inc., that excising exports from the Harbor Tax could lead to conflicts with the United States trading partners and would violate American obligations under the General Agreement on Tariffs and Trade (GATT), and that Congress did not intend to make the application of the Harbor Tax to exports severable from the balance of the tax because of such concerns. In rejecting this argument in Amoco Oil, supra, the Court of International Trade noted that although there was "some evidence [in the legislative history] to support" the argument that "Congress was so fearful of negative GATT implications that it would not have enacted the [Harbor Tax] on imports without the [Harbor Tax] on exports," it was "insufficient to rebut the strong presumption of severability." Amoco Oil, supra, slip op. at 9,12. Neither our trading partners nor the World Trade Organization has taken final formal action directed against the Harbor Tax. It is speculative and conjectural whether they will do so. If they take such action and the result is to create serious problems, either the executive or the legislative branch presumably will take appropriate action.
 
 
 71
 In sum, Carnival has not presented the "strong evidence" necessary to overcome the "presumption that Congress did not intend the validity of the statute in question to depend on the validity of the constitutionally offensive provision." Alaska Airlines, 480 U.S. at 686.
 
 CONCLUSION
 
 72
 The judgment of the Court of International Trade that the Harbor Tax "is unconstitutional as it applies to cruise ship passengers" and ordering the refund of the tax fees collected on Carnival cruise ships, is reversed. The case is remanded to that court for further proceedings consistent with this opinion, including consideration of Carnival's other objections to the imposition of the tax on cruise ship passengers that that court has not yet decided.
 
 
 73
 REVERSED AND REMANDED.