# BOARD OF PUBLIC UTILITY COMMISSIONERS *v.* YNCHAUSTI, & COMPANY ET AL.

## CERTIORARI TO THE SUPREME COURT OF THE PHILIPPINE ISLANDS.

No. 190.   Argued January 27, 1920.—Decided March 1, 1920.

Acceptance of a license from the Philippine Government to engage in the coastwise trade does not oblige the licensee to fulfill a condition imposed contrary to the Philippine Bill of Rights.  P. 404.

In licensing vessels to engage in the Philippine coastwise trade, the Philippine Government is authorized to require, as a condition, free transportation of mails.  P. 405.

Such authority is found in its continuous exercise by the local military and civil governments without interference by Congress; in failure of Congress to disapprove local legislation, giving it effect, which under the Act of July 1, 1902, must be reported to Congress; and in its recognition by the Act of April 15, 1904, which authorizes the local government to regulate transportation between local ports and places until American registry of Philippine-owned vessels shall have been authorized by Congress.  *Id.*

The Philippine Government having thus authority from Congress to impose the duty to carry the mails free as a condition to engaging in coastwise trade, its law imposing such condition does not deprive the licensee of rights without due process, or take property for public use without just compensation, in violation of the Philippine Bill of Rights.  *Id.*

The Constitution does not limit the power of Congress when legislating for the Philippines as when legislating for the United States.  P. 406.
Reversed.

THE case is stated in the opinion.

Mr. *Chester J. Gerkin* and Mr. *Edward S. Bailey* for petitioner.

Mr. *Alex. Britton*, with whom Mr. *Evans Browne* was on the brief, for respondents.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

Was error committed by the court below in deciding that the Philippine law which imposed upon vessels engaged in the coastwise trade, for the privilege of so engaging, the duty to carry the mails free to and from their ports of touch, was void for repugnancy to the Philippine Bill of Rights—is the question which comes before us for decision as the result of the allowance of a writ of certiorari.

The issue will be clarified by a brief reference to the antecedents of the controversy. Under the Spanish law as enforced in the Philippine Islands before the American domination the duty of free carriage as stated existed. Upon the cession of the Islands to the United States and the establishment there of a military government the existing condition of the subject was continued in force. It thus continued until the government passed into the hands of the Philippine Commission and was by that body specifically recognized and its further enforcement directed. Thus it prevailed without interruption until 1902, when the first act of Congress providing a general system of civil government for the Islands was passed, and it further remained operative until 1904, when Congress passed the act of that year specifically dealing with the authority of the Philippine Government to provide for the coastwise trade, as follows (33 Stat. 181):

"Until Congress shall have authorized the registry as vessels of the United States of vessels owned in the Philippine Archipelago the government of the Philippine Islands is hereby authorized to adopt, from time to time, and enforce regulations governing the transportation of merchandise and passengers between ports or places in the Philippine Archipelago."

In fact the continued operation of the obligation to

carry the mails free which arose from engaging in the coastwise trade, it may be taken for granted, remained in force until 1916, since the obligation was recognized as being yet in existence and the duty to enforce it for the future was directed by § 309 of the Administrative Code of that year, in which code were also stated the existing provisions as to the registry, licensing, etc., of Philippine vessels. That the requirement continued operative thereafter results from the further fact that it was re-expressed in § 568 of the Administrative Code of 1917, which code was adopted to meet the exigencies created by the later Organic Act of the Philippine Islands enacted by Congress in August, 1916 (39 Stat. 545).

We have not stopped to refer to the Spanish law, to the military orders, to the reports of civilian officials, and to the action of the Philippine Commission on the subject, as above stated, because the references to them were made below in Marginal Note A, which Mr. Justice Carson made a part of his dissenting opinion.

It is undoubted that during all this period vessels were permitted to engage in the coastwise trade only upon the issuance to and the acceptance by them of licenses, the enjoyment of which depended upon the performance of the legal duty of the free carriage of the mails.

The respondents were in 1916 the owners of steam vessels of Philippine registry, licensed to engage in the coastwise trade upon the condition stated, and the controversy before us arose in consequence of a notice given by them to the Philippine Director of Posts that after a date designated they would no longer comply with the duty to carry the mails free. That official sought its enforcement at the hands of the Board of Public Utility Commissioners. Before that Board the respondents, the licensees, relied upon the assertion that the section of the Administrative Code imposing the duty of free mail carriage was in conflict with the provisions of the Philippine Bill of Rights,

guaranteeing due process and prohibiting the taking of private property for public use without just compensation. The Board overruled the defense and awarded an order directing compliance with the law and therefore prohibited the carrying out of the intention to discontinue. In reaching this conclusion the Board held that its sole duty was to ascertain whether the law imposed the obligation to carry the mails free, and if it did, to enforce it without regard to the defense as to the repugnancy of the statute to the Bill of Rights, since that question was proper only to be disposed of by judicial action.

The Supreme Court to which the controversy was taken, not differing as to the existence of the statutory duty, reversed the order on the ground that such duty could not be exacted consistently with the clauses of the Bill of Rights relied upon. No opinion stating the reasons for this conclusion was expressed, but a member of the court dissented and stated his reasons in an elaborate opinion.

It is impossible to conceive how either the guaranty by the Bill of Rights of due process or its prohibition against the taking of private property for public use without compensation can have the slightest application to the case if the Philippine Government possessed the plenary power, under the sanction of Congress, to limit the right to engage in the coastwise trade to those who agree to carry the mails free. It must follow that the existence of such power is the real question which is required to be decided. In saying this we put out of view as obviously erroneous the contention that, even though the Bill of Rights applied and limited the authority of the Government so as to prevent the exaction by law of the free carriage of the mails, that result is not applicable here because by accepting a license the ship-owners voluntarily assumed the obligation of free carriage. *Southern Pacific Co.* v. *Denton,* 146 U. S. 202, 207; *Western Union Telegraph Co.* v. *Kansas,* 216 U. S. 1, 27–30; *Pullman Co.*

*v. Kansas*, 216 U. S. 56, 70; *Meyer v. Wells, Fargo & Co.*, 223 U. S. 298, 300, 301; *Kansas City, Fort Scott & Memphis Ry. Co. v. Kansas*, 240 U. S. 227, 233–234; *Western Union Telegraph Co. v. Foster*, 247 U. S. 105, 114.

To what extent the Bill of Rights limits the authority of the Government of the Philippine Islands over the subject of the free carriage of the mails is, then, the determinative factor. Beyond doubt Congress, in providing a Bill of Rights for those Islands, intended its provisions to have there the settled construction they have received in the United States. But it must be and is indisputable that when the provisions of such Bill come to be applied to governmental powers in the Philippine Islands, the result of their application must depend upon the nature and character of the powers conferred by Congress upon the Government of the Islands. To illustrate, where a particular activity in the Philippine Islands is, as the result of power conferred by Congress, under governmental control to such an extent that the right to engage in it can be made by the Philippine Government dependent upon the performance of a particular duty, it is obvious that the exaction of such a duty, as such prerequisite condition, can be neither a denial of due process or a taking of property without compensation.

Coming to the proposition to which the case is therefore ultimately reduced, we see no reason to doubt that the Philippine Government had the power to deal with the coastwise trade so as to permit its enjoyment only by those who were willing to comply with the condition as to free mail carriage and therefore that no violation of individual right could have resulted from giving effect to such condition. We reach this conclusion because the possession and exercise of such power in the Islands before their cession to the United States, its exertion under the military government of the United States which followed the cession, and its continuance by every form of civil

government created by Congress for the Islands, compels
to that view in the absence of any law expressly providing
to the contrary or which by reasonable implication leads
to that result.

Indeed, the conclusion that the power was possessed
does not rest alone upon the general consideration stated,
since it is additionally sustained by recalling the express
provision of the Act of Congress of 1904, to which we have
previously referred, giving authority for the registry of
Philippine vessels and recognizing the power of the Gov-
ernment of the Philippine Islands to deal with the coast-
wise trade, an authority which, as it contains no provision
tending to the contrary, must be construed as applicable
to and sanctioning the power which had been exerted
from the very inception of the American domination, to
provide as to that trade for the free carriage of the mails.
In other words, in view of the power to impose the burden
in question, exerted in the Philippine Islands from the
beginning and which was then being exerted under the
authority of Congress, the conferring by Congress upon
the Philippine Government by the Act of 1904 of the
authority to make regulations concerning such trade was a
recognition of the right to make the regulation theretofore
made, which was then in force, and which continued to be
in force up to the time of the bringing of this suit, without
disapproval or change by Congress.

When the authority which the Act of 1904 gave is
borne in mind it makes it clear that the mistake which
underlies the entire argument as to the non-existence of
power here relied upon arises from the erroneous assump-
tion that the constitutional limitations of power which
operate upon the authority of Congress when legislating
for the United States are applicable and are controlling
upon Congress when it comes to exert, in virtue of the
sovereignty of the United States, legislative power over
territory not forming part of the United States because not

incorporated therein. *Downes* v. *Bidwell*, 182 U. S. 244; *Hawaii* v. *Mankichi*, 190 U. S. 197, 220; *Dorr* v. *United States*, 195 U. S. 138; *Dowdell* v. *United States*, 221 U. S. 325, 332; *Ocampo* v. *United States*, 234 U. S. 91, 98.

The error which thus underlies the whole argument becomes more conspicuously manifest by recalling that Congress in the Act of 1904 expressly provided that the authority which that act gave should exist only until Congress should otherwise provide, and, besides, that before the passage of that act, the Act of July 1, 1902, c. 1369, § 86, 32 Stat. 691, 712, provided "that all laws passed by the government of the Philippine Islands shall be reported to Congress, which hereby reserves the power and authority to annul the same."

*Judgment reversed.*