247 F.Supp. 196 (1965)
John P. MORGAN and Christine Morgan, Plaintiffs,
v.
Nicholas DeB. KATZENBACH, as Attorney General of the United States, and New York City Board of Elections consisting of James M. Power, Thomas Mallee, Maurice J. O'Rourke, and John R. Crews, Defendants.
Civ. A. No. 1915-65.
United States District Court District of Columbia.
November 15, 1965.
Probable Jurisdiction Noted January 24, 1966.
*197 *198 Alfred Avins, Memphis, Tenn., for plaintiffs.
St. John Barrett and David Rubin, Dept. of Justice, for defendant Katzenbach, and for Intervener United States.
Leo A. Larkin, Corp. Counsel of the City of New York, and Morris Einhorn, Asst. Corporation Counsel, New York City, for the defendants James M. Power and others.
Louis F. Lefkowitz, Atty. Gen. of the State of New York, Ruth Kessler Tock, Asst. Sol. Gen., and Jean M. Coon, Asst. Atty. Gen., Albany, N. Y., filed a brief as amici curiae in support of plaintiffs' position.
Before McGOWAN, Circuit Judge, HOLTZOFF, District Judge, and McGARRAGHY, District Judge.
Probable Jurisdiction Noted January 24, 1966. See 86 S.Ct. 621.
HOLTZOFF, District Judge.
The question presented in this case is whether the Congress has constitutional power to regulate by statute the qualifications of voters and to supersede the requirements prescribed by the States. Specifically the issue is the constitutionality of Section 4(e) of the Voting Rights Act of 1965, which in effect provides that no person who has been educated in an American school in which the predominant language is other than English, shall be disqualified from voting under any literacy test. As a corollary, the ultimate problem is whether this provision of the Act of Congress supersedes the literacy test for voters prescribed by the constitution and statutes of the State of New York, which impose the ability to read and write English as a requirement for voting.
The action is brought by voters in the City of New York, who claim that the weight of their votes is being adversely affected by the fact that numerous citizens living in New York City, who have migrated from Puerto Rico and who read and write only in the Spanish language, are being permitted by the local authorities to vote in disregard of the State literacy test and in compliance with the Act of Congress, which the plaintiffs claim is unconstitutional when it conflicts with State law. The defendants are the Attorney General of the United States and the members of the Board of Elections of the City of New York. The plaintiffs seek a declaratory judgment and an injunction restraining compliance with the Act of Congress. In view of the fact that this action is brought to enjoin the enforcement of an Act of Congress on the ground of its repugnance to the Constitution of the United States, a statutory three-judge court was convened, 28 U.S. C. §§ 2282 and 2284. The United States has been permitted to intervene in support of the validity of the Act of Congress, 28 U.S.C. § 2403, and Rule 24(a) of the Federal Rules of Civil Procedure. The Attorney General of the State of New York has filed a brief as amicus curiae in support of the plaintiffs' contention.
The plaintiffs clearly have a standing to sue. A voter who claims that the weight of his vote is being diluted or impaired by the ballots of others who are not legally entitled to vote, has a right to challenge their right of suffrage and to bring appropriate proceedings to prevent their votes from being cast or counted.[1]
The Voting Rights Act of 1965 (Act of August 6, 1965, Public Law 89-110, U.S.Code Congressional and Administrative News, p. 2326 et seq.) Section 14(b), provides as follows:
(b) No court other than the District Court for the District of Columbia or a court of appeals in any proceeding under section 9 shall have jurisdiction to issue any declaratory judgment pursuant to section 4 or section 5 or any restraining order or temporary or permanent injunction against the execution or enforcement of any provision of this Act or any action of any Federal officer or employee pursuant hereto.
This provision confers on this Court exclusive jurisdiction of this action. In *199 fact the Attorney General of the United States concedes that this Court has jurisdiction, although the Corporation Counsel of the City of New York contests it. We conclude that jurisdiction exists.[2] The matter is before the Court on cross-motions for summary judgment.
The Constitution of the State of New York, Article II, Section 1, which defines the qualifications of voters, provides, in part, as follows:
Notwithstanding the foregoing provisions, after January first, one thousand nine hundred twenty-two, no person shall become entitled to vote by attaining majority, by naturalization or otherwise, unless such person is also able, except for physical disability, to read and write English.
This requirement is reiterated in Section 150 of the Election Laws of the State of New York,[3] the pertinent provision of which reads as follows:
In the case of a person who became entitled to vote in this state by attaining majority, by naturalization or otherwise after January first, nineteen hundred twenty-two, such person must, in addition to the foregoing provisions, be able, except for physical disability, to read and write English.
It appears from the papers annexed to the motions before the Court and it is undisputed that beginning in about 1940 there was a large migration to New York City of citizens of the United States from Puerto Rico, and that there are several hundred thousand such persons now living in New York. About half of them are unable to read or speak English, but many of them are able to read and write Spanish, because the public schools of Puerto Rico are conducted largely in that language. Thus there is a large group of American citizens residing in New York who are disqualified from voting because of the New York literacy test. It is reasonable to assume that undoubtedly there are other citizens who are also unable to meet the literacy test and are likewise disqualified from voting.
The Voting Rights Act of 1965, which was enacted by Congress and became law on August 6, 1965, as heretofore stated, contains the following provision in Section 4(e):
(e) (1) Congress hereby declares that to secure the rights under the fourteenth amendment of persons educated in American-flag schools in which the predominant classroom language was other than English, it is necessary to prohibit the States from conditioning the right to vote of such persons on ability to read, write, understand, or interpret any matter in the English language.
(2) No person who demonstrates that he has successfully completed the sixth primary grade in a public school in, or a private school accredited by, any State or territory, the District of Columbia, or the Commonwealth of Puerto Rico in which the predominant classroom language was other than English, shall be denied the right to vote in any Federal, State, or local election because of his inability to read, write, understand, or interpret any matter in the English language, except that in States in which State law provides that a different level of education is presumptive of literacy, he shall demonstrate that he has successfully completed an equivalent level of education in a public school in, or a private school accredited by, any State or territory, the District of Columbia, or the Commonwealth of Puerto Rico in which the predominant classroom language was other than English.
If the foregoing Congressional provision is valid, it pro tanto nullifies the *200 constitutional and statutory provisions of New York state, which impose an English literacy test on voters. It would require New York not to apply the literacy requirement exacted by its constitution and laws to voters who have been educated in a public school or accredited private school, in any State, territory, District of Columbia, or the Commonwealth of Puerto Rico, in which the predominant language was other than English. The constitutional and statutory enactments of the State of New York would be abrogated and nullified to that extent.
It is urged by the plaintiffs that the Congressional enactment is invalid and unconstitutional. The Voting Rights Act of 1965 is primarily intended to prevent discriminatory administration of the right to register and vote. Potent machinery is created by the statute to achieve this end. Section 4(e) is, however, completely and entirely disassociated from the rest of the Act and constitutes no part of the scheme of the legislation. The measure originated in the Senate. Section 4(e) was not in the bill as reported by the Senate Committee on the Judiciary. It was inserted by an amendment from the floor. After the bill passed the Senate, the House of Representatives struck out the entire bill except the enacting clause and substituted a different measure, which again did not include any such provision. Section 4(e) was, however, re-inserted by the Conference Committee and remained in the measure as finally passed. It is quite apparent that the Section did not receive consideration by any legislative Committee in either House. While Section 4(e) was directed at the Puerto Rican situation in New York, which has already been briefly described, actually it is much broader in its phraseology and scope and conceivably may be applicable to many other citizens who are illiterate in English, and is effective throughout the United States.
Traditionally and historically the qualifications of voters has been invariably a matter regulated by the States. This subject is one over which the Congress has no power to legislate. Thus Article I, Section 2, of the Constitution of the United States, provides as follows:
The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature.
Article I, Section 4, provides as follows:
The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.
It will be observed that this Section does not include the power to prescribe requisites for the right of suffrage. Power to make or alter regulations concerning "the times, places and manner of holding elections" does not comprise authority to regulate qualifications for voters. No express or implied power is conferred by the Constitution on Congress to legislate concerning requirements for voters in the several States. The matter is within the purview of the Tenth Amendment, which reads as follows:
The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.
The right of suffrage is not a privilege and immunity of a citizen of the United States as such, but is a right conferred by the States. In Minor v. Happersett, 21 Wall. 162, 177, 22 L.Ed. 627, Mr. Chief Justice Waite, in speaking for a unanimous bench, stated:
For nearly ninety years the people have acted upon the idea that the Constitution, when it conferred citizenship, did not necessarily confer the right of suffrage. If uniform practice long continued can settle *201 the construction of so important an instrument as the Constitution of the United States confessedly is, most certainly it has been done here. Our province is to decide what the law is, not to declare what it should be.
In that case it was held that the States had the power of excluding women from the right to vote. It required a Constitutional amendment to grant suffrage to women.
In Pope v. Williams, 193 U.S. 621, 632, 24 S.Ct. 573, 575, 48 L.Ed. 817, the same theory was again enunciated:
The privilege to vote in any state is not given by the Federal Constitution, or by any of its amendments. It is not a privilege springing from citizenship of the United States. Minor v. Happersett, 21 Wall. 162, 22 L.Ed. 627. It may not be refused on account of race, color, or previous condition of servitude, but it does not follow from mere citizenship of the United States. In other words, the privilege to vote in a state is within the jurisdiction of the state itself, to be exercised as the state may direct, and upon such terms as it may seem proper, provided, of course, no discrimination is made between individuals, in violation of the Federal Constitution. (Emphasis supplied.)
The doctrine that the right to vote is not a privilege derived from the United States, but is conferred by the State, was reiterated in Breedlove v. Suttles, 302 U.S. 277, 283, 58 S.Ct. 205, 208, 82 L.Ed. 252, in the following manner:
Privilege of voting is not derived from the United States, but is conferred by the State and, save as restrained by the Fifteenth and Nineteenth Amendments and other provisions of the Federal Constitution, the state may condition suffrage as it deems appropriate. (Emphasis supplied.)
In that case the Supreme Court unanimously held that the States had power to impose a poll tax as a prerequisite for voting. It required a Constitutional Amendment to eliminate the exaction of poll taxes as a condition precedent to voting in Federal elections.
Only within the past year the Supreme Court again restated the same propositions in Carrington v. Rash, 380 U.S. 89, 91, 85 S.Ct. 775, 777, 13 L.Ed.2d 675 as follows:
Texas has unquestioned power to impose reasonable residence restrictions on the availability of the ballot. Pope v. Williams, 193 U.S. 621 [24 S.Ct. 573, 48 L.Ed. 817]. There can be no doubt either of the historic function of the States to establish, on a nondiscriminatory basis, and in accordance with the Constitution, other qualifications for the exercise of the franchise. Indeed, "[t]he States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised." Lassiter v. Northampton County Bd. of Elections, 360 U.S. 45, 50 [79 S.Ct. 985, 3 L.Ed.2d 1072]. Compare United States v. Classic, 313 U.S. 299 [61 S.Ct. 1031, 85 L.Ed. 1368]; Ex parte Yarbrough, 110 U.S. 651 [4 S. Ct. 152, 28 L.Ed. 274]. "In other words, the privilege to vote in a state is within the jurisdiction of the state itself, to be exercised as the state may direct, and upon such terms as to it may seem proper, provided, of course, no discrimination is made between individuals, in violation of the Federal Constitution." Pope v. Williams, supra, 193 U.S. at 632 [24 S.Ct. at 575].
This case will be hereafter discussed in another connection.
The case of Lassiter v. Northampton County Bd. of Elections, 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072, decided in 1959, is practically on all fours with the case at bar. The State of North Carolina prescribed a literacy test for voters in the English language. A voter brought suit in the Federal court for a declaration that the requirement was unconstitutional. *202 The Supreme Court unanimously upheld the validity of the test and the power of the State to impose it. In its opinion, which was written by Mr. Justice Douglas, the Court discussed the authority of the States vis-a-vis the power of the Congress in this field, in the following illuminating manner, p. 50, 79 S. Ct. p. 989:
The States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised, Pope v. Williams, 193 U.S. 621, 633 [24 S. Ct. 573, 48 L.Ed. 817]; Mason v. State of Missouri, 179 U.S. 328, 335 [21 S.Ct. 125, 45 L.Ed. 214], absent of course the discrimination which the Constitution condemns. Article I, § 2 of the Constitution in its provision for the election of members of the House of Representatives and the Seventeenth Amendment in its provision for the election of Senators provide that officials will be chosen "by the People." Each provision goes on to state that "the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." So while the right of suffrage is established and guaranteed by the Constitution (Ex parte Yarbrough, 110 U.S. 651, 663-665 [4 S.Ct. 152, 28 L.Ed. 274]; Smith v. Allwright, 321 U.S. 649, 661-662 [64 S.Ct. 757, 88 L.Ed. 987]) it is subject to the imposition of state standards which are not discriminatory and which do not contravene any restriction that Congress acting pursuant to its constitutional powers, has imposed. See United States v. Classic, 313 U.S. 299, 315 [61 S.Ct. 1031, 85 L.Ed. 1368]. While § 2 of the Fourteenth Amendment, which provides for apportionment of Representatives among the States according to their respective numbers counting the whole number of persons in each State (except Indians not taxed), speaks of "the right to vote," the right protected "refers to the right to vote as established by the laws and constitution of the state." McPherson v. Blacker, 146 U.S. 1, 39 [13 S.Ct. 3, 36 L.Ed. 869].
There are indeed constitutional limitations on the power of the States to prescribe qualifications for voters. Each of these restrictions, however, has been imposed by an Amendment to the Constitution of the United States. Thus, the Fifteenth Amendment, which became effective in 1870, bars the States from denying or abridging the right of citizens of the United States to vote on account of race, color, or previous condition of servitude: 
Section 1. The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.
By the Nineteenth Amendment, which took effect in 1920, the States are precluded from denying the right of suffrage to women. That Amendment reads as follows:
The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of sex.
The latest Constitutional Amendment in this field is the Twenty-fourth Amendment, which prevents the States from imposing a poll tax as a condition for voting in Presidential and Congressional elections. That Amendment reads as follows:
The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax.
Thus whenever Congress took steps to prohibit the States from imposing a particular requirement or qualification for voting, no matter of what kind, it invariably did so by initiating and proposing *203 a Constitutional Amendment, which later was ratified by the States. So far as is known, until the passage of the Voting Rights Act of 1965, Congress never attempted to achieve this result by legislation. It is quite evident, therefore that it was the continuous and invariable view of the Congress that it may not intrude into this field and does not have power to regulate the subject matter by legislative enactment. If Congress had the authority to take such action by legislation, the use of the laborious process of amending the Constitution would have been an exercise in futility or at least unnecessary surplusage.
In Minor v. Happersett, 21 Wall. 162, 175, 22 L.Ed. 627, to which reference has already been made, Mr. Chief Justice Waite adverted and commented on this point as follows:
And still again, after the adoption of the fourteenth amendment, it was deemed necessary to adopt a fifteenth, as follows: "The right of citizens of the United States to vote shall not be denied or abridged by the United States, or by any State, on account of race, color, or previous condition of servitude." The fourteenth amendment had already provided that no State shall make or enforce any law which should abridge the privileges or immunities of citizens of the United States. If suffrage was one of these privileges or immunities, why amend the Constitution to prevent its being denied on account of race, &c.? Nothing is more evident than that the greater must include the less, and if all were already protected why go through with the form of amending the Constitution to protect a part?
There is indeed an inherent limitation on the States implicit in the Equal Protection of the Laws clause of the Fourteenth Amendment. The States are barred from making an unreasonable classification between various groups of citizens in determining who should have the right to vote. Thus, in Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, supra, it was held that while a State may impose reasonable residence requirements for voting, it may not deny the ballot to a bona fide resident merely because he is a member of the armed forces of the United States. In other words, the State is precluded from distinguishing between residents who are civilians and residents who are members of the armed services, on the ground that such a distinction is an unreasonable classification and discrimination in violation of the Equal Protection of the Laws clause.
This rule is inapplicable in the instant case, because in Lassiter v. Northampton County Board of Elections, 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072, from which we have already extensively quoted, it was held that a distinction between citizens who can read and write English and those who cannot, is not an unreasonable classification and does not violate the Equal Protection of the Laws clause. Moreover, what is involved in the case at bar is not the constitutionality of the New York State literacy test. Its validity is not assailed. What is presented here is the constitutionality of the Congressional enactment which would, in part, abrogate the law of the State.[4]
A veiled intimation that the New York literacy test was intended to exclude Spanish-speaking citizens from the franchise is both irrelevant in law and untenable in fact. The requirement was originally adopted in 1921  long before the large influx of Puerto Ricans into New York.
At the oral hearing in this case, the argument was advanced that the statutory provision here in question may be sustained as an exercise of the power of Congress to legislate for the territories under Article IV, Section 3, Paragraph 2, of the Constitution, which authorizes the Congress to "dispose of and make all needful Rules and Regulations *204 respecting the Territory or other Property belonging to the United States." It is contended that since Section 4(e) relates to citizens of the United States who had been residents of Puerto Rico, therefore, the power of Congress to legislate for the Government of Puerto Rico embraces the authority to enact this provision. There are two answers to this contention. First, Section 4(e) is broad and comprehensive in its terms and is neither limited nor directed solely to Puerto Ricans and, therefore cannot be deemed an exercise of the power to legislate for Puerto Rico. Second, and more important, the power of Congress to legislate for a territory does not embrace authority to confer additional rights on citizens of the territory when they migrate to other parts of the United States. The Congress may not endow them with rights not possessed by other citizens of the State to which they have moved. No persuasive authority is cited in support of the contention of Government counsel on this point.
We have given due consideration to the presumption of validity which attaches to every Act of Congress. That presumption, however, is completely overcome and destroyed by the inescapable conclusion that we have reached from the foregoing discussion to the effect that Section 4 (e) of the Voting Rights Act of 1965, transgresses the powers granted to Congress and, therefore, is repugnant to the Constitution and invalid.
Much of the oral argument and of the written material submitted in behalf of the Government, is intended to demonstrate what is claimed to be the unfairness of excluding from the right to vote in New York, those Puerto Ricans who can read and write Spanish, but are not literate in English. No matter how weighty and cogent such an argument may be, and we express no opinion on this subject, it should be addressed to the Legislature of New York State, rather than to the courts. It is hardly necessary to say that expediency, desirability, and policy of legislation are not the concern of the judiciary. We pass alone on the power to enact the legislation. If any remedy is necessary or desirable, an amendment to the Constitution of the State of New York, possibly implemented by legislation, would seem to be the appropriate recourse and not Congressional legislation.
We conclude that Section 4(e) of the Voting Rights Act of 1965 is unconstitutional. Accordingly, the plaintiffs' motion for summary judgment is granted, and the defendants' cross-motions for summary judgment are denied. Counsel may submit an appropriate order.
McGARRAGHY, District Judge, concurs.
McGOWAN, Circuit Judge (dissenting):
With all respect, I do not join in the disposition made by my colleagues of this challenge to Section 4(e) of the Voting Rights Act of 1965. Theirs is a persuasive statement of the difficulties which attend upon Congressional assertion of a power which has not been expressly granted to the federal legislature in the Constitution, and which may, therefore, be thought to have been reserved to the states by the Tenth Amendment. The prescription of voter qualifications is arguably such a power. But those difficulties do not obtain where a foundation for the Congressional action can be found in a power which has explicitly been reposed in the legislative branch of the federal establishment and the emanations of which speak to the states in the compelling accents of the Supremacy Clause.
I think, unlike my brethren, that a foundation of this kind is discernible for Section 4(e) as against the precise and limited attack made upon it in this record. That foundation resides, as a minimum, in the grant by the Framers to Congress of power to "make all needful Rules and Regulations" in respect of the territories.[1] The majority say that Section *205 4(e) cannot be appraised by reference to this grant because it is in terms "neither limited or directed solely to Puerto Ricans." But the complaint which plaintiffs make about Section 4(e) is confined to allegedly illegal voting by Puerto Ricans; and it seems to me that we are not only authorized, but indeed required under sound principles of constitutional adjudication, to restrict our consideration of the validity of this statute to the particular application of it which, so the plaintiffs themselves tell us, brings them into court.
Thus it is that I do not purport to decide anything about Section 4(e) except in respect of our Puerto Rican citizens resident in New York. As to them, however, I think that Congress has an independent base of legislative power which, wholly apart from the Fourteenth and Fifteenth Amendments, enables Congress to regulate rights of suffrage even in the face of adverse state action. This proposition can perhaps best be both explained and tested by a hypothetical case. Let us suppose that, in these troubled times of 1965, it was determined to be in our national interest for a non-English-speaking country to come into our possession in the status of a territory. Wholly aside from such treaty obligations as we might assume in connection with that accession, it seems evident that we might wish to deal with its inhabitants in a way which would commend itself to our own sense of justice and the fitness of things, as well as to the eyes of a world which has become increasingly sensitive about such matters. Congress, with these considerations in mind, adopts a statute which (1) confers extensive rights of self-government upon the territory, including arrangements which admit of the perpetuation of its cultural heritage through the continued use of the native language in the conduct of the public schools, (2) endows the inhabitants with full American citizenship, including the free right to enter the United States and to take up residence here, and (3) provides that any such person exercising this last-mentioned right shall be privileged to vote in all elections in the state of his residence if his educational attainments are the equivalent of those required of his fellow-citizens, except that they issue in literacy in his native language rather than in English.
I should suppose that there would be little doubt of the power of Congress to enact such a law as a part of its constitutional authority and responsibility for the governance of the territories. And, being an appropriate exercise of an express grant of federal legislative power, it would, under the Supremacy Clause, prevail over any state enactment in conflict with it. I take the Congressional power to make rules and regulations for the territories to comprehend laws relating to the status and rights of the people who inhabit those territories and prescribing that such status and rights are to be recognized throughout the United States as well as in the territory itself. This must be so, if the central purposes of such federal legislation as is hypothesized above are to be realized. To the extent that, as the majority suggest, this may perhaps operate to place citizens of differing national origins in differing positions vis-a-vis the right to vote, the answer is that citizens within the reach *206 of the constitutional grant of power over the territories are inescapably and legitimately separated by that fact from citizens to whom it has never extended. And it is appropriate to reiterate that we are not called upon by this record to define the scope of Congressional power with respect to any of our citizens other than Puerto Ricans.
If, then, it be assumed that Congress could validly enact today a bill of the kind supposed, how closely could it be analogized in substance to what Congress has done over the years in the case of Puerto Rico? The parallel is, in my view, plain.
The controversies rampant at the time about the acquisition of Puerto Rico need not be raked over again. What did emerge from them on the part of most Americans was a unanimity of belief that, once acquired, Puerto Rico should be governed with due regard for the sensitivities of its people as well as world opinion. It was our national purpose to demonstrate, not least to our uneasy selves, that we had not been motivated by the narrow purposes of colonial conquest. There was a swelling impulse to set Puerto Rico on a path leading to a viable independence as speedily as that could be achieved, and an independence which, when it came, would carry with it a true option to preserve and extend a cultural tradition as venerable as our own. It was as if the goals we envisaged for Puerto Rico were as much tests of ourselves, undertaken in the searching glare of colonialist scepticism, as of the Puerto Ricans.
The response of Congress to these sentiments was immediate and sustained, establishing a tradition of enlightened treatment of Puerto Rico which is currently one of the firmest props of our pretensions to a respectful hearing in the councils of the world. Section 4(e) of the Voting Rights Act of 1965 is but the latest legislative act in this tradition. It was preceded by a series of Congressional efforts to advance Puerto Rico to a self-governing independence. The first was the Foraker Act in 1900, 31 Stat. 77, which left only the lower house of the territorial legislature and the Resident Commissioner to the United States to popular election by the Puerto Ricans. In the Jones Act of 1917, 39 Stat. 951, Congress brought the upper house under the same selection process, and gave the Governor of Puerto Rico, then subject to appointment by the President of the United States, the right to appoint four of the six Cabinet members. In 1947, the Jones Act was further liberalized, 61 Stat. 770, by empowering the people of Puerto Rico to elect their own Governor, with the latter privileged to select all of his own Cabinet members.
These forward-looking measures were capped in 1950 by the law which authorized the Puerto Ricans to write their own organic law. 64 Stat. 319. The Senate Committee on Interior and Insular Affairs, reporting favorably on this proposal, said:
This measure is designed to complete the full measure of local self-government in the island by enabling the 2¼ million American citizens there to express their will and to create their own territorial government * * *.
Thus, in the only Latin-American area under the American flag, which is a focal point of inter-American relations, the present measure would give further concrete expression to our fundamental principles of government of, by, and for the people. It is a logical step in the process of political freedom and economic development that was begun even in the days of our military occupation of the island at the end of the last century.[2]
*207 When the Puerto Ricans availed themselves of the privilege afforded by this law and proceeded to adopt a Constitution, our own government acted to notify the United Nations that Puerto Rico was no longer a "non-self-governing nation" within the meaning of Article 73(e) of the Charter. Our official communication in this regard characterized the situation as follows (28 Dept. State Bulletin 587):
By the various actions taken by the Congress and the people of Puerto Rico, Congress has agreed that Puerto Rico shall have, under that Constitution, freedom from control or interference by the Congress in respect of internal government and administration subject only to compliance with applicable provisions of the Federal Constitution, the Puerto Rican Federal Relations Act and the acts of Congress authorizing and approving the Constitution, as may be interpreted by judicial decision.
The Constitution of Puerto Rico, which so came into being in 1952, described its relationship with the United States as in the nature of a "union." United States citizenship and freedom of movement, which are ordinarily associated with true political union, had long before been accorded to Puerto Ricans by Congress. The Jones Act in 1917 gave American citizenship to all Puerto Ricans, and permitted them free entry into this country. The Supreme Court once had occasion to characterize these provisions of the Jones Act as embodying a purpose to place Puerto Ricans "on an exact equality with citizens from the American homeland, to secure them more certain protection against the world, and to give them an opportunity, should they desire, to move into the United States proper and there without naturalization to enjoy all political and other rights." Balzac v. People of Porto Rico, 258 U.S. 298, 311, 42 S.Ct. 343, 348, 66 L.Ed. 627 (1922).
The circumstance that Spanish has for many years been the language in which public school proceedings have been carried on is a closely-related consequence of Puerto Rico's steady march, under the Congressional aegis, towards self-government. Although Congress has never expressly directed that Spanish shall be the language of instruction, it has knowingly created and financed educational machinery which has encompassed that result. In the early years of American rule, English was employed in the public schools.[3] This caused many difficulties and local sentiment against it was strong, both for sentimental reasons and considerations of educational efficiency. Beginning in 1916, Spanish was used in the first four elementary grades, and in 1934 this was extended through the eighth grade. With the 1947 amendments to the Jones Act, the Commissioner of Education was appointed by the popularly elected Governor, and the use of Spanish was promptly extended to all grades. This has continued to be true since 1952 under the Puerto Rican Constitution.[4]
Thus it has been that since 1934  more than 30 years  no Puerto Rican schooled *208 in his native land has been required to become literate in English in the course of an elementary school education extending through the sixth grade  the level adopted by New York as the measure of its educational qualification. Although literate in Spanish  the language in which his schooling in Puerto Rico has been conducted  voting in New York is denied him solely because of his lack of literacy in English. Section 4(e) represents a Congressional judgment that this is not in keeping with long-standing Congressional policies towards Puerto Rico, and that the New York policy should yield to the federal.[5] That is a judgment which, in my view, Congress is entitled to make by reason of the authority and responsibility assigned to it by the Constitution to provide for Puerto Rico and its people. It is not claimed, as it cannot be, that the present status of Puerto Rico has nullified completely such authority and responsibility.
It may be urged that, since Section 4 (e) purports on its face to be a declaration of rights under the Fourteenth Amendment, only that Amendment may be looked to as a measure of the underlying Congressional power. That may well be true if we were dealing with the statute's applicability to persons not within the reach of any other constitutional power. It does not seem to be a necessary conclusion in respect of the Puerto Ricans about whom this lawsuit has been brought and with respect to whom relief is sought. As my colleagues recognize, acts of Congress are to be approached in the first instance as if they were constitutional. Whether this be couched in the language of presumptions, or simply in terms of the comity appropriate between coordinate branches of the same government, it remains true that courts do not invalidate acts of Congress until the search for a foundation for them has been exhausted.
We are concerned here with what Congress has done, and not only with what it has said. If it chooses to characterize the voting status it has elected to confer on Puerto Rican citizens as one within the scope of the Fourteenth Amendment, the validity of that status still turns upon whether Congress can create it, not upon what Congress calls it. That power to create does not have to be discovered solely in the Fourteenth Amendment. It may or may not be there. But that is a question that need not be resolved in the context of this case, involving, as it does, Puerto Ricans who are the objects of Congressional concern under other provisions of the Constitution.
Absent an assertion of overriding federal power, it is presumably the privilege of the people of New York to insist that Puerto Ricans shall, in order to vote, be literate in English. Camacho v. Doe, 7 N.Y.2d 762, 763, 194 N.Y.S.2d 33, 163 N.E.2d 140 (1959); and see Lassiter v. Northampton County Board of Elections, 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959). But with the enactment of Section 4(e), a new element is added; and thereafter it is the function of the Supremacy Clause to elevate Congressional policy over New York policy, valid and enforceable though the latter may formerly *209 have been.[6] If it be said that Art. IV, § 3, is to be read narrowly as limiting Congress to making the rules whereby life is to be carried on in Puerto Rico, the answer is that it has not been so regarded. At least one of the Insular Cases, Downes v. Bidwell, 182 U.S. 244, 21 S. Ct. 770, 45 L.Ed. 1088 (1901), dealt with the regulation of Puerto Rico's external trade by means of the imposition of duties at American ports of entry. Justice Brown, in an opinion supporting the decision that such duties could be imposed by Congress in the exercise of its powers under the territorial clause, characterized that clause as "absolute in its terms, and suggestive of no limitations upon the powers of Congress in dealing with (the territories)." Admittedly, Article IV, Section 3, is terse,[7] and its reach must be defined primarily by reference to the wisdom and necessity of its manifold applications in the light of what the Framers would have intended could they, in Justice Brown's phrase, have "foreseen that, within little more than one hundred years, we were destined to acquire, not only the whole vast region between the Atlantic and Pacific Oceans, but the Russian possessions in American and distant islands in the Pacific * * *."
An expansive view of the sweep of Congressional authority under the territorial clause has been the rule in Supreme Court interpretation of it in lawsuits presenting a wide range of issues.[8] *210 The conspicuous exception was Chief Justice Taney's opinion in Dred Scott v. Sandford, 19 How. 393, 60 U.S. 393, 15 L.Ed. 691 (1956), and that is not widely regarded as one of the Court's happier forays into constitutional exegesis. The power seems to me to be, and to have been intended to be, commensurate with all legitimate and relevant objects of national concern in our relationships with our territories and their peoples, and with the world at large. Assuring our Puerto Rican citizens a right to vote under the circumstances disclosed in this record could rationally have been deemed by Congress to be such an object. As such, its accomplishment by the vehicle of Section 4(e) is not beyond the range of Congressional power.
NOTES
[1] Gray v. Sanders, 372 U.S. 368, 374-375, 83 S.Ct. 801, 9 L.Ed.2d 821.
[2] Cf. McCann v. Paris (W.D.Va.1965) 244 F.Supp. 870, dismissing for lack of jurisdiction an action challenging the validity of another provision of the Voting Rights Act, and holding that this court alone has jurisdiction of the subject matter.
[3] McKinney's Consolidated Laws of New York, Book 17, p. 327, c. 17.
[4] The New York courts have sustained the validity of the literacy test. Camacho v. Doe, 7 N.Y.2d 762, 763, 194 N.Y.S.2d 33, 163 N.E.2d 140, affirming 31 Misc.2d 692, 221 N.Y.S.2d 262.
[1] U.S.Const. art. IV, § 3. Puerto Rico came under American rule by virtue of the Treaty of Paris of 1899, ending the Spanish-American War. That treaty provided, among other things, that "[t]he civil rights and political status of the native inhabitants of [Puerto Rico] shall be determined by the Congress." 30 Stat. 1754, at 1759. Section 4(e) could, thus, perhaps be regarded as legislation in furtherance of a valid treaty, finding its ultimate authority in the Treaty Power. Art. II, § 2. The New York City Board of Elections has pressed upon us quite strongly another international engagement of the United States in the form of the United Nations Charter. 59 Stat. 1045. Article 55 of the Charter commits the organization to the promotion of "universal respect for, and observance of, human rights and fundamental freedoms for all without distinction as to race, sex, language, or religion"; and the individual signatories are bound to seek to achieve these purposes. I do not think it necessary to base Section 4(e) upon these treaties. They are suggestive of the climate in which Congress presumably approaches its responsibilities under its Art. IV, § 3, powers.
[2] S.Rep.1779, 81st Cong., 2d Sess. The Committee took cognizance of an earlier communication to it on behalf of the Secretary of State which said:

It is believed that, with their own constitution, the high degree of internal self-government which the Puerto Ricans today enjoy in their voluntary association with the United States, will assume for them an added significance. Moreover, such action by our government would be in keeping with the democratic principles of the United States and with our obligations under the Charter of the United Nations to take due account of the political aspirations of the people in our Territories and to develop self-government in them.
In view of the importance of `colonialism' and `imperialism' in anti-American propaganda, the Department of State feels that S. 3336 would have great value as a symbol of the basic freedom enjoyed by Puerto Rico, within the larger framework of the United States of America.
[3] Under the Foraker and Jones Laws  the so-called Organic Acts  Congress vested authority over the Puerto Rican public schools in an Island Commissioner of Education. This official was a Presidential appointee from 1900 to 1947. His initial policy was to use Spanish in the first eight grades, and English in all others. This went on from 1900 to 1905, at which time English was used in all grades.
[4] Although Puerto Rico has often been the recipient of funds for educational assistance voted by Congress, these grants have never been conditioned upon instruction in English and have been made knowingly in the light of the use in Puerto Rico of Spanish as the official teaching language.
[5] In the Senate, both of the New York Senators, Javits and Kennedy, who sponsored Section 4(e), stressed the inequity of denying the vote to Puerto Ricans who had been educated in Spanish as a consequence of Congressional policies. Senator Kennedy pointed out that (111 Cong. Rec. 10675):

In school [the typical educated Puerto Rican] reads, in Spanish, the same textbooks which his fellow citizen on the mainland reads in English. That his schooling takes place in Spanish is not up to him, but is due to the fact that the U. S. Government has chosen to encourage the cultural autonomy of the Commonwealth of Puerto Rico, to make Puerto Rico a showcase for all of Latin America.
Representatives Ryan and Gilbert from New York were the House proponents of Section 4(e). They concurred in emphasizing the "anomaly" of Congressional action "to encourage the perpetuation of Puerto Rico's Spanish language culture and at the same time do nothing to protect the rights of citizenship of Puerto Ricans who move to other sections of the country." 111 Cong.Rec. 15666.
[6] The challenge here made to Section 4(e) goes mainly to the existence of Congressional power, and not to the propriety, in terms of reasonableness, of this particular exercise of it. This emphasis is tactically well-advised, since there would appear to be little doubt on the latter score. Other states having large non-English-speaking elements have not emulated New York in barring them from voting. In Hawaii, persons literate either in English or Hawaiian may vote, Rev.Laws of Hawaii (1955), Sec. 11-8. The Louisiana Constitution has long required as a voting qualification only literacy either in English or a mother tongue. New Mexico, in deference to its large Spanish-speaking population, has no English literacy requirement and prints its ballots and instructions in both Spanish and English. N. Mex. Statutes (1953), §§ 3-3-7, 3-3-12, 3-2-41. Thus the impact of Section 4(e) in New York is one which Congress might well have viewed with equanimity, especially in the light of the national interests which it was thought to advance.
[7] The reason why the "question of territories was dismissed with a single clause" was not, in Justice Brown's view, far to seek. It lay in the fact that "the vast possibilities of that future (of the geographical sway of the Constitution) could never have entered the minds of its framers. The states had but recently emerged from a war with one of the most powerful nations of Europe, were disheartened by the failure of the confederacy, and were doubtful as to the feasibility of a stronger union. Their territory was confined to a narrow strip of land on the Atlantic coast from Canada to Florida, with a somewhat indefinite claim to territory beyond the Alleghenies, where their sovereignty was disputed by tribes of hostile Indians supported, as was popularly believed, by the British, who had never formally delivered possession under the treaty of peace. The vast territory beyond the Mississippi, which formerly had been claimed by France, since 1762 had belonged to Spain, still a powerful nation and the owner of a great part of the Western Hemisphere. Under these circumstances it is little wonder that the question of annexing these territories was not made a subject of debate. The difficulties of bringing about a union of the states were so great, the objections to it seemed so formidable, that the whole thought of the convention centered upon surmounting these obstacles. * * *" 182 U.S. 284, 285, 21 S.Ct. 786.
[8] Statements are legion that Congress has broad powers over the territories and their inhabitants. Hooven & Allison Co. v. Evatt, 324 U.S. 652, 674, 65 S.Ct. 870, 89 L.Ed. 1252 (1945); Public Utility Comm'rs v. Ynchausti & Co., 251 U.S. 401, 406, 40 S.Ct. 277, 64 L.Ed. 327 (1920); Binns v. United States, 194 U. S. 486, 491, 24 S.Ct. 816, 48 L.Ed. 1087 (1904); Dooley v. United States, 183 U. S. 151, 157, 22 S.Ct. 62, 46 L.Ed. 128 (1901). Such power has been explained as being required by the special problems created by the territories and the need for flexibility in dealing with them. Balzac v. People of Porto Rico, 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1921); Dorr v. United States, 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128 (1904); Territory of Hawaii v. Mankichi, 190 U.S. 197, 218, 23 S.Ct. 787, 47 L.Ed. 1016 (1903). Legislation by Congress pursuant to the territorial clause, and by territorial legislatures deriving their authority from the Congressional power, has frequently been sustained in circumstances where constitutional limitations might otherwise have been insuperable. Balzac v. People of Porto Rico, supra; Public Utility Comm'rs v. Ynchausti & Co., supra; Dowdell v. United States, 221 U.S. 325, 31 S.Ct. 590, 55 L.Ed. 753 (1911); Dorr v. United States, supra; Territory of Hawaii v. Mankichi, supra; Dooley v. United States, supra; Downes v. Bidwell, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901); see Rabang v. Boyd, 353 U.S. 427, 432, 77 S.Ct. 985, 1 L.Ed.2d 956 (1957).